Santiago DIAZ, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 383, 1998.

Supreme Court of Delaware.

Submitted: Aug. 17, 1999.
Decided: Dec. 16, 1999.

David J.J. Facciolo, Assistant Public Defender, Wilmington, Delaware, for appellant.

John Williams, Deputy Attorney General, Dover, Delaware, for appellee.

Before VEASEY, C.J., WALSH and HOLLAND, JJ.

HOLLAND, Justice:

Following a jury trial in the Superior Court, the defendant-appellant, Santiago Diaz, was convicted of Attempted Unlawful Sexual Intercourse in the Second Degree;[1] Assault in the Third Degree;[2] Offensive Touching;[3] and Endangering the Welfare of a Child.[4] The Superior Court sentenced Diaz to a minimum mandatory ten years of incarceration at Level V, followed by confinement at Levels IV and III, for the Attempted Unlawful Sexual Intercourse in the Second Degree. He was sentenced to a total of three months at Level V for the remaining charges.

Diaz has raised six issues in this direct appeal. First, he contends that his Sixth Amendment rights were violated when the Superior Court denied two separate defense motions for a mistrial that were based upon the conduct of a bilingual juror. Second, Diaz argues that the prior out-of-court statements of the two witnesses were improperly admitted under 11 *Del. C.* § 3507. Third, Diaz submits that permitting the jury to see the indictment, which denominated two of the five counts as felonies, impermissibly informed the

---

1. 11 *Del. C.* § 774(1)a, *repealed by* 71 Del. Laws, c. 285, § 12 (1998) (codified at 11 *Del. C.* § 772(2)(a)).

2. 11 *Del. C.* § 611(1).

3. 11 *Del. C.* § 601.

4. 11 *Del. C.* § 1102(1)a.

jury of the potential sentences. Fourth, Diaz contends it was an abuse of discretion for the trial judge to allow the adult complaining witness to be impeached by her immigration status. Fifth, Diaz contends that the Superior Court failed to cure the improper reference to Diaz's incarceration by the adult complaining witness. Finally, Diaz submits that a rational trier of fact could not reasonably conclude that there was sufficient evidence to support the four guilty verdicts.

We have concluded that the Superior Court's disposition of the issues relating to the bilingual juror's misconduct constituted reversible error. We have also concluded that some of the evidentiary issues raised by Diaz will need to be re-examined by the Superior Court at Diaz's new trial. The reasons for these conclusions are set forth in this opinion.

### *Facts*

At approximately 3:00 a.m. on February 25, 1996, Officer Richard A. Sutton was dispatched to an apartment on West Fourth Street in the City of Wilmington. Upon arriving, Officer Sutton spoke with seven-year-old Maria Diaz ("Maria") and her mother, Maria Rivera ("Ms.Rivera"). Since Ms. Rivera spoke limited English, Maria acted as a translator for her mother.

Maria told Officer Sutton that she was sleeping in the rear bedroom of the apartment and woke up when she heard her mother screaming. Maria saw her mother lying on the bed and her father, Santiago Diaz, hitting her mother. According to Maria, when she tried to stop the assault, her father slapped her in the face.

With Maria translating, Ms. Rivera told Officer Sutton about the events that occurred prior to her daughter's intervention. Ms. Rivera stated that she was in the living room when Diaz entered through a window. According to Ms. Rivera, Diaz then ripped her top off, pulled hair out of her head, and dragged her from the living room to the bedroom. In the bedroom, Ms. Rivera said Diaz punched her while

she was on the bed and bit her near the pubic area. Ms. Rivera also stated that when Maria woke up, Diaz slapped his daughter in the face and then put his hand over the girl's mouth to quiet her.

During the initial investigation, on February 25, 1996, Officer Sutton observed blood stains on the mattress. He noted that Ms. Rivera had bruises, a lacerated lip, and blood coming from her ear. Sutton also observed and photographed the bite mark on Ms. Rivera's stomach.

Since Ms. Rivera spoke Spanish and only limited English, a Spanish-speaking officer, Detective Guillermo Santiago, was asked to interview her again. On February 27, 1996, Detective Santiago interviewed Ms. Rivera outside the apartment in a police car. Detective Santiago testified he had no difficulty communicating in Spanish with Ms. Rivera.

During an interview on February 27, 1996, Ms. Rivera told Detective Santiago of the assault by Diaz that she had related two days earlier to Officer Sutton. Speaking in Spanish, Ms. Rivera told Detective Santiago that she was sitting on the living room couch when Diaz climbed in the window. According to Ms. Rivera, Diaz took her into the bedroom, threw her on the bed, ripped off her clothes, and attempted to have sexual intercourse with her.

Ms. Rivera told Detective Santiago that she was naked on the bed and that Diaz bit her twice, once right about the pubic area and another time on the inside of her thigh. Ms. Rivera showed Detective Santiago the same bite mark on her stomach that Officer Sutton had viewed and photographed. Ms. Rivera also told Detective Santiago that Maria woke up during the struggle, and that when the child tried to put a sheet over her mother, Diaz slapped his daughter across the face. Detective Santiago did not interview Maria.

Diaz was arrested on February 27, 1996. He was interviewed in Spanish after his

arrest. Diaz denied striking his daughter or attempting to rape the child's mother.

Bettina Jones, a Delaware Department of Justice social worker, interviewed Maria and her mother on March 27, 1996. At this interview, Maria told Ms. Jones that she was awakened by her parents arguing, saw her father hit her mother, and tried to stop the assault. Maria told Ms. Jones that her father slapped her in the face with his open hand and that it hurt.

With Maria again acting as a translator, Ms. Jones spoke with Ms. Rivera about the February assault. According to Ms. Rivera's account to Ms. Jones, she first encountered Diaz while sitting on the living room couch. Diaz took her to the bedroom, where he ripped off her clothes and wanted to have sexual relations with her. When Ms. Rivera refused, Diaz kicked and slapped her, and bit her in the vaginal area. He also slapped the couple's daughter. Ms. Rivera denied that her sister, Altagarcia Nunzez, known as Josie, was present in the apartment during the attack by Diaz.

At trial on May 28, 1998, both Maria and Ms. Rivera related different accounts of the February 25, 1996 events. Maria was nine years old at the time of the trial in 1998. She testified that she saw her father push her mother. Maria testified that her father also hit her but "by accident."

In her trial testimony, Ms. Rivera claimed she made a false report to the police because she was jealous. Ms. Rivera testified that she hit Diaz with a candlestick because she was angry with him. Ms. Rivera also testified that her sister was hiding in the bathroom when the police arrived on February 25, 1996.

The State called Ms. Jones, Officer Sutton and Detective Santiago to introduce the prior statements of Maria and Ms. Rivera into evidence.[5] The defense objected to the admission of those statements on separate grounds. Both objections were overruled.

Diaz testified that he did not enter the apartment through a window, did not attack Ms. Rivera, did not tear off her clothes, and did not make any sexual advances. He testified that Ms. Rivera slapped and scratched him while they were in the living room. While he was trying to calm her down in the bedroom, she pushed him and he hit his head on the bedroom bureau. Diaz also testified that he did not remember accidentally hitting his daughter.

The trial testimony of Ms. Rivera's sister, Josie, generally confirmed Diaz's explanations. Josie denied that Diaz had attacked her sister and testified that Ms. Rivera was the one who started pulling off her clothes in the living room and hitting Diaz. She stated she saw Ms. Rivera push Diaz, who then hit his head on the bedroom bureau.

### Juror # 6
### English Comprehension
### Voir Dire Inconclusive

The first issues raised by Diaz are related to the seating of a bilingual juror to hear and decide his case. When the venire was assembled for the jury selection process, the panel was collectively asked several voir dire questions. The prospective jurors were then requested to come to the side-bar individually if they had given an affirmative answer to any of the voir dire questions, or if they had any other concerns to express. The record reflects that the following exchange occurred at the side-bar conference with a prospective juror.

> Prospective Juror: ... English is my second language and sometimes I have difficulty understanding everything in English, so I don't want to make the wrong decision because of my English.

---

**5.** Under the authority of 11 *Del. C.* § 3507.

Judge: Okay. It sounds as though you are pretty good in English. The thing is, we expect to have an interpreter and if you are a juror, I can ask her to interpret in Spanish louder than she might ordinarily.

Prospective Juror: That would be good.

Judge: You will hear the witness. Some of the witnesses will testify in Spanish.

Prospective Juror: Okay.

Judge: Is that okay?

Prospective Juror: That's fine....

Judge: ... You're okay with that? You feel comfortable with that?

Prospective Juror: Yeah.

Judge: Okay.

Prosecutrix: Your Honor, can I clarify: Are you going to have [the official interpreter] translate for the jurors? Is that what you're suggesting? The English—

Judge: Actually, questions will be asked in English. Okay? Some witnesses might respond in Spanish and have that translated into English.

Do you follow me?

Prospective Juror: Yeah.

Judge: So that would be no problem for you, then, would it?

Prospective Juror: I understand a lot. Just with new words I would have a problem with that and, you know, I don't know the meaning of—you know, make decisions—a decision that I would be wrong because I didn't understand a word.

Judge: Well, if you were a juror and you let me know what words you don't understand—

Prospective Juror: Mm-hmmm.

Judge:—would that be helpful?

Prospective Juror: Okay. And it would be—

Judge: Because if there's something—if there's a word you don't understand and you were a juror, just raise your hand and we will take care of that.

Prospective Juror: Okay.

Judge: Is that okay?

Prospective Juror: That's fine.

Judge: Okay.

The prospective juror returned to her seat. There were no objections to the trial judge's limited voir dire or suggested course of action for addressing the prospective juror's concerns about her English language ability. Neither of the attorneys asked for the prospective juror to be excused for cause or later used a peremptory challenge to remove her. This prospective juror was ultimately seated as Juror # 6 for Diaz's trial.

■ The Delaware juror qualification statute provides, in part, that "all persons are qualified for jury service except those who: ... are unable to read, speak, and understand the English language."[6] In accordance with the statute, the trial judge must decide whether a prospective juror has the ability to read, speak, and understand the English language. Various cases and treatises have emphasized the important role of voir dire examination in determining the English literacy of prospective jurors.

One of the first cases to examine the federal requirement that jurors possess basic English proficiency stated:

There is no real risk of litigants being tried by juries unable to understand the evidence since if any veniremen lack sufficient facility with English to render competent jury service, they can be and are eliminated on voir dire .... [7]

The conduct of such voir dire was examined in a subsequent case in *U.S. v. Cortes.*[8] The defendant moved for a new trial on the basis that one of the jurors

---

6. 10 *Del. C.* § 4509(b)(4).

7. *U.S. v. Valentine*, D.P.R., 288 F.Supp. 957, 965 (1968).

8. *U.S. v. Cortes*, D.P.R., 440 F.Supp. 689 (1977).

should have been disqualified because of her inability to understand English. The court held that the procedure whereby prospective jurors are required to read, write and understand the English language with a degree of proficiency to satisfactorily complete the juror qualification form, combined with submission to two separate voir dire proceedings in English, provided the defendant with a jury sufficiently proficient in English.[9]

■ In Delaware, the trial judge must use his or her discretion in determining whether each prospective bilingual juror has a sufficient command of English to meet the statutory requirements. This discretion should be exercised after obtaining substantive information through expanded individual voir dire questions that elicit more than "yes" and "no" responses.[10] Prospective jurors must be excused if they cannot demonstrate a sufficient knowledge of English.[11] If the trial judge is not satisfied that a prospective juror's English proficiency comports with the requirements of the statute, that person should be dismissed, not only from the jury venire for the case, but also from the master jury pool.

Instead of conducting expanded voir dire to determine whether Juror # 6's understanding of English satisfied the statutory requirements, the trial judge simply stated "it sounds as though you are pretty good in English." The judge then advised Juror # 6 that an official interpreter would be used during part of the trial proceedings and would be available if Juror # 6 wanted clarification in Spanish of any English testimony she did not understand.

After the entire jury was empaneled for Diaz's trial, but before the proceedings began, the judge offered additional assistance to Juror # 6 in open court, as follows:

> I would mention at this time that I certainly don't—don't want to embarrass you, [Juror # 6], but you indicated previously that your primary language is Spanish and your secondary language is English. Please, if there's a word you don't understand, I do invite you to raise your hand and that will be a signal for the attorneys or the Court to restate what was just said, maybe using another word that you would understand.

Once again, the attorneys for the parties raised no objection or requested any other action by the trial judge. The voir dire record in this case does not reflect any basis for or ruling by the trial judge that Juror # 6 was proficient in reading, speaking, or understanding the English language.[12]

### Special Juror Voir Dire
### Foreign Language Evidence
### English Interpretation Binding

■ Voir dire is critical to protecting a defendant's Sixth Amendment right to a fair trial by an impartial jury.[13] In the United States, voir dire is the historic method used to identify bias in prospective jurors.[14] The purpose of the voir dire is to ensure the selection of qualified jurors who have no bias or prejudice that would prevent them from returning a verdict based on the law and the evidence that is admit-

---

9. *Id.* at 691; *accord U.S. v. Ramos–Colon, D.P.R.,* 415 F.Supp. 459 (1976).

10. *U.S. v. Cortes,* 440 F.Supp. at 691; *see also* William E. Hewitt, National Center for State Courts, *Court Interpretation: Model Guides for Policy and Practice in State Courts* 147 (1995) (discussing the Model Voir Dire for Determining the Need for an Interpreter).

11. *U.S. v. Cortes,* 440 F.Supp. at 691.

12. 10 *Del. C.* § 4509(b)(4).

13. *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *Rosales–Lopez v. U.S.,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).

14. *United States v. Burr,* 25 F. Cas. 49, 51 (C.C.D.Va.1807).

ted during trial.[15] With the increasing number of bilingual persons in the United States, the scope of voir dire has been expanded.

This Court formed a Task Force on Racial and Ethnic Fairness in 1995[16] to study racial and ethnic fairness issues in connection with proceedings in Delaware courts. In 1996, Administrative Directive 107[17] was promulgated in direct response to some of the preliminary findings of that Task Force. Administrative Directive 107 instituted some minimum requirements related to the use of court interpreters in Delaware trial court proceedings[18] and stated, in part:

(1) The Delaware justice system is based upon the guiding principle that all persons, regardless of age, color, gender, national origin, physical or mental disability, race, religion, sexual orientation, or socioeconomic status, should have equal access to the judicial system.

(2) Bias or invidious discrimination with respect to age, color, gender, national origin, physical or mental disability, race, religion, sexual orientation or socioeconomic status, is inimical to the proper functioning of the judicial system.

(3) In recognition of the diversity of persons who appear in and utilize the Delaware courts, it is important to institute minimum requirements related to the use of court interpreters in Delaware courts.

. . .

(11) Appropriate explanations of the role of an interpreter should be provided to the jury in trial involving juries. An example of an appropriate explanation is as follows:

Proceedings Interpretation

This Court seeks a fair trial for all regardless of the language they speak and regardless of how well they may or may not use the English language. Bias against or for persons who have little or no proficiency in English because they do not use English is not allowed. Therefore do not allow the fact that the party requires an interpreter to influence you in any way.

Witness Interpretation

Treat the interpretation of the witness's testimony as if the witness had spoken English and no interpreter were present. Do not allow the fact that testimony is given in a language other than English affect your view of the witness's credibility.[19]

■ Although Diaz's trial took place in 1998, the provisions set forth in this Court's 1996 Administrative Directive were not used. The considerations set forth in Administrative Directive 107 should be an integral part of the veniremen's voir dire whenever a foreign language court interpreter will participate in the trial. In the seminal decision of *Hernandez v. New York*, the United States Supreme Court stated:

Just as shared language can serve to foster community, language differences can be a source of division. Language elicits a response from others, ranging from admiration and respect, to distance and alienation, to ridicule and scorn. Reactions of the latter type all too often result from or initiate racial hostility.[20]

Therefore, the English-only speaking jurors should be asked during voir dire if the fact that some testimony would be given in a language other than English would influence them in any way. Additional voir

15. Edward J. Devitt et al., Federal Jury Practice and Instructions § 3.01 (3d ed.1999).

16. Administrative Directive No. 101, Supreme Court of Delaware (April 5, 1995).

17. Administrative Directive No. 107, Supreme Court of Delaware (Apr. 4, 1996).

18. Appendix I.

19. *Id.*

20. *Hernandez v. New York*, 500 U.S. 352, 371, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

dire is required if bilingual persons who will serve on the jury are proficient in both English and the language of a party or witness that will be translated by an interpreter during the trial.

Thus, voir dire must have a dual focus when testimony or other evidence is presented in a foreign language that is understood by a prospective bilingual juror. First, the trial judge must determine that the prospective juror's English proficiency comports with Delaware's statutory requirements.[21] Second, a determination must be made regarding the ability of a bilingual juror to follow the trial judge's instructions to rely exclusively upon the court interpreter's translation of testimony into English from the foreign language that is understood by the prospective juror.

Issues relating to the second determination have been examined in many judicial decisions and academic writings after the seminal decision in *Hernandez*[22] by the United States Supreme Court almost a decade ago. *Hernandez* involved the review of a New York case in which the prosecutor had used peremptory challenges to exclude Latino bilingual jurors from the panel. The question presented in *Hernandez* was the proper application of the holding in *Batson v. Kentucky*.[23] In *Batson*, the Supreme Court held that the use of peremptory challenges to exclude African–Americans from a jury violated the Equal Protection Clause of the Fourteenth Amendment.

In *Hernandez*, the prosecutor explained to the trial judge that his challenges were not based upon the race or ethnicity of the veniremen, but rather on his uncertainty "as to whether they could accept the interpreter as the final arbiter of what was said by each of the witnesses, especially where there were going to be Spanish-speaking witnesses."[24] After voir dire was completed, the prosecutor stated he was not confident that the bilingual veniremen would accept the court interpreter's translation from Spanish into English. The prosecutor asserted that the peremptory challenges were then used based upon his conclusion that those prospective jurors' ability to understand the Spanish-speaking witnesses would cause them to have an unfair impact if they conveyed their own inadmissible translations of foreign language testimony to the other jurors.[25]

**21.** 10 *Del. C.* § 4509(b)(4).

**22.** *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

**23.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**24.** *Hernandez v. New York,* 500 U.S. at 356, 111 S.Ct. 1859.

**25.** To illustrate his point, the prosecutor cited a case to the trial judge where a juror failed to accept the official translation of the foreign-language testimony, i.e., *U.S. v. Perez,* 9th Cir., 658 F.2d 654 (1981). In *Perez,* the following exchange occurred in open court between one juror and the interpreter:

[Juror]: Your Honor, is it proper to ask the interpreter a question? I'm uncertain about the word La Vado [sic]. You say that is a bar.

The Court: The Court cannot permit jurors to ask questions directly. If you want to phrase your question to me—

[Juror]: I understood it to be a restroom. I could better believe they would meet in a restroom rather than a public bar if he is undercover.

The Court: These are matters for you to consider. If you have any misunderstanding of what the witness testified to, tell the Court now what you didn't understand and we'll place the—

[Juror]: I understand the word La Vado [sic]—I thought it meant restroom. She translates it as bar.

[Interpreter]: In the first place, the jurors are not to listen to the Spanish but to the English. I am a certified court interpreter.

[Juror]: You're an idiot.

*U.S. v. Perez,* 9th Cir., 658 F.2d 654, 662 (1981). The judge allowed the juror to ask a question to clarify the translation, and directed the prosecution to relay additional questions to the witness. After a discussion in chambers with the juror where she claimed she said, "It's an idiom," not "You're an idiot," the judge decided that the juror would have an undue influence on the jury and dismissed her the next day. *U.S. v. Perez,* 9th Cir., 658 F.2d 654, 663 (1981).

In *Hernandez*, the Supreme Court affirmed the New York Court of Appeal's holding that the prosecutor's explanations for using peremptory challenges to strike bilingual persons from the jury were race-neutral. In a plurality opinion, Justice Kennedy stated:

> Our decision today does not imply that exclusion of bilinguals from jury service is wise, or even that it is constitutional in all cases. It is a harsh paradox that one may become proficient enough in English to participate in a trial, only to encounter disqualification because he knows a second language as well.[26]

Many scholars have noted that attorneys will often object to having bilingual persons serve as jurors in a case where evidence will be presented for the English-only speaking jurors in a language that is known to the bilingual juror. It is thought that these objections are based on one or both of the following fears:

> That the interpreter's version of the testimony will differ materially from the actual testimony, so that bilingual jurors will hear and rely upon a different version of the testimony than monolingual English-speaking jurors; [or] assuming that the interpreter's version is faithful to the original [non-English] testimony, bilingual jurors could claim that the [non-English] testimony was different from what the interpreter said it was, and so undermine potentially the jury's deliberations.[27]

The reasonableness of these fears and remedies for the problems each anticipates have been discussed in several articles and books.[28]

### Bilingual Jurors
### Foreign Language Evidence
### Special Instructions Required

■ In trials involving foreign language testimony and English translation when one or more jurors are bilingual, federal judges endeavor to maintain a completely impartial jury by giving special instructions to the entire jury panel prior to opening arguments and at the end of the case, which state:

> Languages other than English may be used during this trial. The evidence you are to consider is only that provided through the official court (interpreters) (translators). Although some of you may know the non-English language used, it is important that all jurors consider the same evidence. Therefore, you must base your decision on the evidence presented in the English (interpretation) (translation). You must disregard any different meaning of the non-English words.[29]

These instructions direct the bilingual jurors to base their judgment only upon the admissible evidence introduced at trial, i.e. the English translation. Consequently, as in any other situation where the court seeks to cure any prejudice or unfairness by instructing the jury to disregard inadmissible evidence or testimony, federal trial judges are instructing the bilingual juror to: ignore the inadmissible evidence; base their judgment solely on the admissible evidence; and refrain from discussing

---

**26.** *Hernandez v. New York*, 500 U.S. at 371, 111 S.Ct. 1859.

**27.** Charles M. Grabau & Llewellyn J. Gibbons, *Protecting the Rights of Linguistic Minorities: Challenges to Court Interpretation*, 30 New Eng. L.Rev. 227, 304 (1996).

**28.** The extent of material differences between actual testimony in a foreign language and an interpreter's translation was studied extensively by Professor Susan Berk–Seligson in

*The Bilingual Courtroom: Court Interpreters in the Judicial Process*. Susan Berk–Seligson, *The Bilingual Courtroom: Court Interpreters in the Judicial Process* (Univ. of Chicago Press 1990). *See also* Deborah A. Ramirez, *Excluded Voices: The Disenfranchisement of Ethnic Groups from Jury Service*, 1993 Wis. L.Rev. 761 (1993).

**29.** Model Crim. Jury Instr. 9th Cir. §§ 1.12, 3.18.

inadmissible evidence in the jury room.[30] Similarly, these instructions, like other curative admonitions, direct *all* jurors to disregard inadmissible evidence when they deliberate.[31] We have concluded that these types of instructions should be given by Delaware judges in appropriate circumstances, e.g., those extant at Diaz's trial.

■ We also concur with Justice Kennedy's suggestion in *Hernandez* that it would also be appropriate to instruct bilingual jurors to discreetly advise the trial judge through the bailiff of any concerns they may have about the English translation during trial. This should be accomplished by a written note. Once the discrepancy is resolved, after consultation with the attorney's on the record, the trial judge should again instruct the bilingual juror to rely only upon the official translation by the court's interpreter. The bilingual juror should also be reminded not to discuss with the other jurors any of his or her own variation on that translation.[32]

### *Diaz Jury Selection Bilingual Juror # 6 Special Voir Dire Absent*

■ The purpose of voir dire examination is to provide the trial judge with sufficient information to decide whether prospective jurors can render an impartial verdict based on the evidence developed at trial and in accordance with the applicable law.[33] Voir dire is also the procedure that enables the State and defense counsel to effectively exercise challenges. The right to challenge prospective jurors, either peremptorily or for cause, is one of the primary safeguards available to secure an impartial jury.[34]

■ If the trial judge's special instructions to bilingual jurors are to have full force and effect after the entire jury is empaneled, their substance must be made known during the voir dire of all prospective jurors. Bilingual jurors must be questioned individually regarding their ability: to treat their own foreign language translation as inadmissible evidence; to base their judgment solely upon the official interpreter's translation that is admitted into evidence; and to refrain from discussing inadmissible evidence (their own translation) with other jurors.

■ In addition to the foregoing inquiries, the record should also reflect the actions of the parties' attorneys and the trial judge's rulings.[35] The exact nature and extent of any voir dire examination rest within the sound discretion of the trial judge.[36] The exercise of that discretion, however, is limited by the essential demands of fundamental fairness.[37]

30. *Ramirez,* supra note 28, at 794.

31. *Id.* at 795.

32. Acknowledging that a policy of striking all persons who speak a given language without regard to the particular circumstances of the trial or the individual responses of the jurors may be found to be a pretext for racial discrimination, Justice Kennedy suggested that a trial judge could consider other factors when deciding if *Batson* has been violated. For example, the trial court could suggest that bilingual jurors be permitted to discreetly advise the judge of any concerns they may have with the translation during trial. If an attorney persists in trying to strike bilingual veniremen despite the accommodation, the trial judge could take this into account in determining whether the peremptory challenges were race-neutral. *Hernandez v. New York,* 500 U.S. at 364, 111 S.Ct. 1859. *See also Pemberthy v. Beyer,* 3d Cir., 19 F.3d 857 (1994).

33. *Hughes v. State,* Del.Supr., 490 A.2d 1034, 1041 (1985) (citing *Parson v. State,* Del.Supr., 275 A.2d 777, 780 (1971)).

34. *Jackson v. State,* Del.Supr., 374 A.2d 1, 2 (1977).

35. *Hernandez v. New York,* 500 U.S. at 365, 111 S.Ct. 1859.

36. *Parson v. State,* 275 A.2d at 780; *Aldridge v. United States,* 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931).

37. *Hughes v. State,* 490 A.2d at 1041.

■ In the Diaz case, the record reflects there was no voir dire of Juror # 6 regarding either her ability to base her judgment on the court interpreter's translation of the foreign language testimony or Juror # 6's obligation not to discuss her own translation with the other jurors. Under the circumstances presented, the failure to conduct such voir dire constituted error.[38] Juror # 6's improper conduct occurred during the course of Diaz's trial when Juror # 6 disagreed with the interpreter's translation of Ms. Rivera's testimony from Spanish to English. That misconduct is directly attributable to the complete absence of any voir dire originally or any special instructions later directed to Juror # 6 regarding her duty to adhere to the court interpreter's translation from Spanish to English and to refrain from discussing any different translation of her own with the other jurors.

### Diaz's Mistrial Motions Denied
### Bilingual Juror's Improper Translations

Diaz made two motions for mistrial based upon the conduct of Juror # 6. The Superior Court denied both motions. The first incident occurred when the prosecutor was questioning Ms. Rivera, about "a bite mark." Ms. Rivera denied it was "a bite" and said the mark ". . . could be something to do with lips, rouge." The prosecutrix then asked Ms. Rivera, "Now, this picture that was taken in the hospital, are you trying to tell us, Mrs. Rivera, that [oval] mark is lipstick near your vagina?"

Before Ms. Rivera could answer, the prosecutrix said, "We have an offer from another Spanish-speaking person in the room that it's a 'suck mark.'" The record then reflects that one or two persons in the courtroom, including Juror # 6, were in disagreement with the interpreter's translation and interjected out loud in open court that Ms. Rivera was saying she had a "suck mark," not a bite mark. De-

fense counsel asked for a side bar conference and moved for a mistrial.

The following excerpt is from part of that side-bar exchange:

Judge: Okay. And the fact of the matter is, on your other point, I think the record should be made clear we had voir dire. She said English is her secondary language. You knew from the get-go that this case was going to have interpretation from Spanish to English, English to Spanish. And you also know that this juror speaks Spanish. You also—you also had agreed to [have the court translator] as the interpreter [for Juror # 6].

Defense Counsel: The ground rules was if she has a problem with the interpretation, the juror would raise her hand and make it known. That's not what happened. So I don't think that's the problem as caused by this counsel's agreements to accept—

Judge: Raising of hands was with regard to "I don't understand that English word."

Defense Counsel: It didn't happen though, your Honor.

Judge: Anyway, you're asking for a mistrial. That's denied.

. . .

After the trial judge denied the defense mistrial motion, the interpreter agreed with the translation that had apparently been proposed by Juror # 6. The trial judge did not give any instructions to Juror # 6 or the other person who had interpreted the translation of Ms. Rivera's testimony. The trial judge also did not instruct all jurors to rely only upon the court interpreter's translation of Ms. Rivera's testimony.

The second defense motion for a mistrial, also based on conduct attributable to Juror # 6, was made on the next trial day. The record reflects the following:

Judge: Good morning.

---

38. *Hughes v. State*, 490 A.2d at 1043.

Prosecutrix: Good morning, your Honor.

Judge: Bailiff, could you repeat what you told me up in chambers? You can be seated.

Bailiff: Juror Number Six got a hold of me this morning. She said that one thing that [the interpreter] translated yesterday for Maria was not correct and it has changed the whole scenario of the trial. I don't know what she meant by "the whole scenario," but she said it's changed her whole feelings. It's made it different.

Judge: Okay. It's a new one on me.

So I think we ought to bring Juror Number Six into the courtroom and let me question her a little bit.

Bailiff: Okay

(Juror Number Six, ..., entered the courtroom at 11:25 a.m.)

Judge:

Q. Hi. Good morning.

A. Good morning.

Q. [Juror # 6], could you—you can have a seat ma'am, and just talk into the microphone, if you will. I don't mean to embarrass you. And I hope that you're not embarrassed.

A. No, I'm not.

Q. Okay. Thank you.

The bailiff has told us that, in your opinion, [the interpreter] was inaccurate in some of her translations of the witness yesterday.

A. At least one of the pictures—one of the pictures.

Q. Can you be more specific?

A. Okay. There was a picture that was showing the living room and it was asked of Maria Rivera if the blood—let me see. Let me see if I remember from yesterday—that what was on the floor and she said that was blood, and then Maria was explaining—they asked Maria, how did that blood get on the floor. So Maria was explaining that she had blood all over her and then when she went to the living room, the blood just got, you know, on the floor. But what I understood the translation yesterday was that this is what Maria said that the blood just got, you know, on the floor from her, but the translation—the translation made by—[the interpreter] was different. I think she said that Maria went to the living room and saw the blood—saw the blood on the floor.

Q. Okay.

A. And I think that it changes the whole picture of, you know, where the accident really happened. Because if it happened in the bathroom and now Maria—if Maria said that the blood was there, that means that everybody is going to think that maybe the accident happened in the living room.

To me, if she already said that the accident happened in the bedroom and she said that she went to the living room and because of all the blood she had with—you know, it went down the floor.

Q. Okay. Is there another instance where you believe that there was an incorrect translation or is that the only one?

A. That's the only one.

Judge: Okay. Thank you very much. You can return to the jury room.

Prosecutrix: Your Honor, could you ask her whether there's been any conversation with other jurors about this?

Q. Have you talked to other jurors about this?

A. I did mention that I thought one of the translations was not correct.

Judge: Okay. Thank you, ma'am. You can go back to the jury room.

...

Defense Counsel: Your Honor, my client asks the court for a mistrial, because there was discussion among the jurors. Whatever the court's decision on that, I understand, but I must make it for the record, because it's a serious matter and it relates to my objection yesterday.

Judge: How so?

Defense Counsel: Well, this is the same juror that I thought interjected the word "hickey" or a similar word and I felt that was the equivalent of a juror testifying.

Judge: Okay. Well, I've already ruled on that. And as far as your—I'll call it a renewed motion or second motion—

Defense Counsel: Second motion.

Judge: What she told the jury was inconsequential, only that there was a mistake in translation, according to Juror Number Six, and that will be clarified as we begin the trial again today. So the motion is denied.

. . .

Once again, the trial judge gave no instructions to Juror # 6 individually or to the jury panel collectively. The trial judge also did not question the other jurors about the nature or extent of what they had been told by Juror # 6.[39]

### Diaz Denied Fair Trial
### Extraneous Prejudicial Evidence

The right to a fair trial by an impartial jury of one's peers is fundamental to the American criminal justice system.[40] The Sixth Amendment to the United States Constitution states:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

An essential ingredient of that right is for jury verdicts to be based solely on the evidence presented at trial.[41] The accused's rights to confrontation, cross-examination and the assistance of counsel[42] assure the accuracy of the testimony which the jurors hear and safeguard the proper admission of other evidence.[43] Those rights can be exercised effectively only if evidence is presented to the jury in the courtroom.[44]

Both sides in a criminal proceeding have an interest in what information is given to the jury. When, as in Diaz's trial, the jury includes a bilingual juror and the testimony of some witnesses are in a language other than English, restrictions on the juror who is conversant with that foreign language are essential.[45] The rules of evidence and the translation of a qualified court interpreter would be vitiated if a bilingual juror was free to give his or her own opinion on the proper translation of foreign language testimony to the other jurors.[46]

The record reflects that Juror # 6 stated that her disagreement with the official interpreter's translation of Ms. Rivera's Spanish testimony "changes the whole picture of, you know, where the accident really happened." The record also reflects that Juror # 6 discussed her disagreement

**39.** *Smith v. State,* Del.Supr., 317 A.2d 20, 23 (1974).

**40.** *Hughes v. State,* Del.Supr., 490 A.2d 1034, 1040 (1985) (citing *Irvin v. Dowd,* 366 U.S. 717, 721, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)).

**41.** *Hughes v. State,* 490 A.2d at 1040 (citing *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) and *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948)).

**42.** *Turner v. Louisiana,* 379 U.S. at 473, 85 S.Ct. 546.

**43.** *Smith v. State,* 317 A.2d at 23.

**44.** *Id.*

**45.** *United States v. Fuentes–Montijo,* 9th Cir., 68 F.3d 352, 355 (1995).

**46.** *Id.*

with the other jurors. It was clearly improper for Juror # 6 to convey her own translation of Ms. Rivera's foreign language testimony to the other jurors. The impact of Juror # 6's comments to the other jurors about her disagreement with the court interpreter's foreign language translations is appropriately described in the following quote:

> Had evidence of such matters been offered and admitted over his objections, it would have been reversible error. If the admission of such evidence in the trial, where he at least might have had opportunity to meet and perchance explain the damaging facts, would be prejudicial, it cannot be less so when the facts are brought to the attention of the jurors in the jury room by one of their fellows whose word, of course, the others have no reason to doubt and without the knowledge or consent of defendant nor with any opportunity for him to explain the facts or rebut the unfavorable inferences.[47]

In Diaz's case, Juror # 6 became an unsworn, uncross-examined, and unqualified witness who presented inadmissible evidence of her own foreign language translation to the other jurors. The issue is whether the communication of that inadmissible evidence by Juror # 6 to the other jurors, outside of the courtroom, infringed on Diaz's right to a fair trial. The United States Supreme Court has indicated that due process requires trial courts to "take strong measures to ensure that the balance is never weighed against the accused."[48] In Diaz's case, however, the trial judge did not question the other jurors, did not give either the other jurors or

Juror # 6 any curative instruction, and did not take any remedial action.

■ The Superior Court's inaction makes it impossible for Diaz to demonstrate that the other jurors were actually biased by the prejudicial information to which they were exposed by Juror # 6.[49] "Under these circumstances, requiring a defendant to show 'actual bias' would be too onerous a burden to impose."[50] This Court and the United States Supreme Court have held that "even if there is no showing of actual bias in the tribunal, . . . due process is denied by circumstances that create the likelihood or the appearance of bias."[51] Diaz has met the burden of persuasion.

■ Twenty-five years ago, this Court held "fairness and, indeed, the integrity of the judicial process, make it imperative that jurors receive information about the case only as a corporate body in the courtroom."[52] A defendant in a criminal case is denied his Sixth Amendment right to a trial by an impartial jury if only one juror is improperly influenced.[53] The record of Juror # 6's misconduct, in combination with the absence of any inquiry or curative action by the Superior Court, compels this Court to conclude that Diaz's Sixth Amendment right to a fair trial was violated. Consequently, Diaz's convictions must be reversed and this matter will be remanded for a new trial.

### 3507 Admissibility
### Foreign Language Statements
### Proper Interpretation Required

A majority of individuals responding to this Court's Racial and Ethnic Fairness

47. *Hughes v. State*, Del.Supr., 490 A.2d at 1045 n. 13 (*quoting State v. Malone*, 333 Mo. 594, 62 S.W.2d 909, 914 (1933)).

48. *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

49. *Hughes v. State*, 490 A.2d at 1046.

50. *Id.*

51. *Hughes v. State*, 490 A.2d at 1047 (*quoting Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972)).

52. *Smith v. State*, 317 A.2d at 23.

53. *Hughes v. State*, 490 A.2d at 1040 (*quoting Styler v. State*, Del.Supr., 417 A.2d 948, 951–2 (1980)).

Task Force's statewide public opinion poll said that at least some improvement was needed in accommodating those with special language needs in the Delaware courts. A substantial majority of judges, lawyers, and court employees responding to the Task Force survey said that they had observed difficulties in communicating with witnesses or parties in the courts due to language difficulties. The vast majority of the need for interpreters involved Spanish interpretation.

In 1996, this Court unanimously directed, in part, that:

(1) A certification program should be developed and implemented for court interpreters providing foreign language interpretative services in Delaware, with priority given to certification of court interpreters providing services in the most commonly utilized languages, including Spanish. Towards that end, the Administrative Office of the Courts (AOC) shall explore all options for obtaining access to approved oral certification/proficiency language tests and interpreter training programs being developed through a consortium of states under the auspices of the National Center for State Courts.

(2) The AOC shall develop and maintain a list of qualified court interpreters located in all counties based upon the following criteria: criminal history background evaluations and other background information, including feedback from courts or others who have utilized the interpreter's services, and certifications status (once the certification program is implemented). This list shall include sign language interpreters who have registered with the Delaware Registry of Interpreters for the Deaf.

(3) The AOC shall develop a systematic method for recording costs and data related to the use of court interpreters by court and county.

(4) To be included on the list of qualified court interpreters, a court interpreter must complete an orientation session presented by AOC personnel, or demonstrate that he or she has satisfactorily completed comparable training in legal or court interpreting. Orientation sessions will include presentations on the role of the interpreter in the court process, ethical issues related to court interpretation, the structure of the Delaware court and justice system, social and cultural diversity issues and basic legal terminology, among other topics, and will be given on a regular basis. The implementation date of this provision will be six months from the effective date of this Administrative Directive to allow a reasonable time for court interpreters to satisfy this requirement.

(5) Interpreters included on the list maintained by the AOC should be utilized for the provision of interpretative services in court proceedings, unless none of the listed interpreters are willing or available to provide services at the time or date those services are needed by the Court.

(6) To guide the professional conduct of court interpreters the annexed Code is adopted and promulgated as "The Delaware Court Interpreters' Code of Professional Responsibility."

(7) Each court interpreter employed by the Judiciary to provide interpretative services in connection with a proceeding before any court in Delaware or any other activity ordered by a court or conducted under the supervision of a court shall swear, under oath, that they will comply with the provisions set forth in the Delaware Court Interpreters' Code of Professional Responsibility.[54]

The Delaware Court Interpreters' Code of Professional Responsibility [55] is modeled

---

**54.** Appendix I.

**55.** Appendix II, originally an attachment to Administrative Directive No. 107, Supreme

Court of Delaware (Apr. 4, 1996); *see* Appendix I.

on the Code of Professional Responsibility for Interpreters in the Minnesota State Court System. It prescribes ten canons that explain and govern the conduct of the interpreter in the Delaware court system. Before participating in any court proceeding, all interpreters must swear under oath that they will comply with the provisions of the Delaware Court Interpreters' Code of Professional Responsibility.[56]

In response to Administrative Directive 107, Delaware joined the State Court Interpreter Certification Consortium which had been created by the National Center for State Courts and the states of Minnesota, New Jersey, Oregon, and Washington in 1995.[57] At the present time, Delaware's Chief Magistrate, Patricia W. Griffin, is the Chair of that Consortium. This nationwide program develops rigorous proficiency exams using legal and forensic terminology in English and another language. To pass the exams, prospective court interpreters must possess mastery of both English and the chosen foreign language at the level of an educated native speaker. In addition, they must have the ability to interpret in the simultaneous, consecutive, and sight modes, and be able to convey messages accurately, completely, and promptly.[58]

Ultimately, the goal is to assess an interpreter's ability to interpret with exactitude while accurately reflecting a speaker's nuances and level of formality. The interpreter must interpret the original source material without editing, summarizing, deleting, or adding while conserving the language level, style, tone, and intent of the speaker. The interpreter must render what may be termed the 'legal equivalent' of the source message.[59]

Administrative Directive 107 was in effect at the time of Diaz's 1998 trial. Therefore, the Superior Court was required to use a qualified foreign language interpreter from the list maintained by the Administrative Office of the Courts, unless none of the listed interpreters was willing or available. In addition, the interpreter employed by the Superior Court was required to comply with the Delaware Court Interpreters' Code of Professional Responsibility.[60]

 In this appeal, Diaz does not raise any concerns with regard to the court interpreter who translated Ms. Rivera's trial testimony from Spanish to English. Diaz does, however, challenge the admission of the English translation by others of Ms. Rivera's three prior out-of-court statements that were originally given by Ms. Rivera in Spanish. Specifically, Diaz contends that the Superior Court erred by summarily dismissing his request for a showing that the English translations of Ms. Rivera's prior out-of-court statements were made by a qualified interpreter.

**56.** *Id.*

**57.** Minnesota Supreme Court Interpreter Advisory Committee, Best Practices Manual on Interpreters in the Minnesota State Court System app. J at J–26 (1999). William E. Hewitt, *Court Interpretation: Model Guides for Policy and Practice in the State Courts* (National Center for State Courts, State Justice Institute, 1995). *See United States v. Franco*, 136 F.3d 622, 626 (9th Cir.1998); *United States v. Valencia*, 5th Cir., 957 F.2d 1189, 1194–95, *cert. denied* 506 U.S. 889, 113 S.Ct. 254, 121 L.Ed.2d 185 (1992).

**58.** *Id.* app. J at J–24. Simultaneous interpreting is defined as "rendering an interpretation continuously at the same time someone is speaking." Consecutive interpreting is "rendering statements made in a source language into statements in the target language intermittently after a pause between each completed statement in the source language." Sight interpretation, also known as sight translation, is a hybrid type of interpreting whereby the interpreter reads a document written in one language while converting it orally into another language.

**59.** *Id.* at 9 (citing William E. Hewitt, *Court Interpretation: Model Guides for Policy and Practice in the State Courts* (National Center for State Courts, State Justice Institute, 1995)).

**60.** Appendix II.

Section 3507 [61] provides in pertinent part, as follows:

(a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

(b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party.

■ Thus, the statute provides that if a Section 3507 statement is admitted it "may be used as affirmative evidence with substantive independent testimonial value." This Court has held that before the out-of-court statement can be introduced into evidence, the witness must touch on both the events perceived and the out-of-court statement itself.[62] The witness must also be present and subject to cross-examination.

When a witness testifies in a foreign language, the direct and cross-examination is made known to the trier of fact only by a qualified interpreter. When a prior out-of-court statement was originally given in another language, it is imperative that the trial judge ascertain the accuracy of that translation *before* the English interpretation of the statement is admitted into evidence. The accuracy of the translation is dependent upon the qualification of the interpreter. It would be incongruous and fundamentally unfair to have a qualified interpreter for the translation of the direct and cross-examination of foreign language trial testimony and have no standard for the interpreter who translated a Section 3507 statement from a foreign language into English. Once the English translation of the Section 3507 statement is admitted into evidence, the statute gives it "substantive independent testimonial value."

In Diaz's case, Ms. Rivera gave three prior out-of-court statements in Spanish. The Spanish statements to Officer Sutton and Ms. Jones were both translated by Ms. Rivera's then seven-year-old daughter. The Spanish statement to Detective Santiago was translated by Detective Santiago. Unfortunately, none of these original out-of-court statements in Spanish was tape-recorded.[63] Therefore, Diaz could not challenge the accuracy of the translations with his own interpreter.

A person who is unquestionably fluent in a foreign language may not understand the role of an official interpreter and the ethical issues related to court interpretation. Before the English translations of Ms. Rivera's prior out-of-court statements in Spanish were admitted pursuant to 3507, Diaz was entitled to have an independent judicial determination made with regard to the interpreter's proficiency in Spanish, understanding of the role of an interpreter, and knowledge of the ethical issues related to court interpretation. Those judicial determinations should be made on the record at Diaz's new trial before a ruling is made on the admissibility of each Section 3507 statement that was originally given in Spanish.

That does not mean, however, that such a prior out-of-court statement is admissible *ipso facto* under Section 3507. Moreover, when Ms. Rivera was subsequently interviewed on a non-emergency basis by Ms. Jones and Officer Santiago, it was desirable to have a qualified interpreter present and to record the entire exchange, especially if the State wanted to retain the option of trying to introduce that prior out-of-court statement pursuant to Section 3507.

---

**61.** 11 *Del. C.* § 3507.

**62.** *Keys v. State*, Del.Supr., 337 A.2d 18, 23 (1975).

**63.** It is certainly reasonable for a police officer to rely on whatever foreign language translation assistance is available when he or she responds to an emergency call for immediate help. Therefore, Officer Sutton properly relied on seven-year-old Maria's assistance for the purpose of communicating with her mother when he responded to investigate.

### New Trial
### Other Evidentiary Issues

■ Because Diaz will have a new trial, we will comment briefly on the other evidentiary issues in this appeal. First, Diaz challenges the admission of Maria's out-of-court statements pursuant to Section 3507. Those objections can be renewed at the new trial and the Superior Court's prior rulings should not be deemed to be the law of the case. Second, the State acknowledges that an inadvertent reference to Diaz's incarceration was improper. There is no reason that reference should be repeated at Diaz's next trial. Third, Diaz argues that the Superior Court erred by permitting the State to disclose Ms. Rivera's immigration status for impeachment purposes. At Diaz's next trial, the State should first demonstrate that her immigration status was, in fact, an actual concern of Ms. Rivera's prior to the time she called the police, and then the Superior Court should then determine if the probative value of that immigration status to the State's case is outweighed by any unfair prejudice to Diaz.

### Indictment and Deliberations
### Felony Misdemeanor Distinction

■ The decision to make an indictment available to the jury during its deliberations is within the discretion of the trial judge.[64] Diaz contends the trial judge abused that discretion by failing to redact the indictment's reference to the charges as felonies or misdemeanors because those designations improperly informed the jury of the possible penalties Diaz would receive. It is well-established that, except in the penalty phase of a capital murder case, the jury's function is to determine guilt or innocence without regard to the penal consequences.[65] The State aptly argues that

an element of some crimes is a predicate finding by the jury that the crime occurred during the commission of a felony.[66] We hold that it was not an abuse of discretion for the Superior Court permit the jury to know from the indictment that certain charges were either a felony or a misdemeanor.

### Conclusion

The judgments of the Superior Court are reversed. This matter is remanded for a new trial in accordance with this opinion.

### APPENDIX I

### ADMINISTRATIVE DIRECTIVE NO. 107

This 4th day of April, 1996,

IT APPEARS THAT:

(1) The Delaware justice system is based upon the guiding principle that all persons, regardless of age, color, gender, national origin, physical or mental disability, race, religion, sexual orientation, or socioeconomic status, should have equal access to the judicial system.

(2) Bias or invidious discrimination with respect to age, color, gender, national origin, physical or mental disability, race, religion, sexual orientation or socioeconomic status, is inimical to the proper functioning of the judicial system.

(3) In recognition of the diversity of persons who appear in and utilize the Delaware courts, it is important to institute minimum requirements related to the use of court interpreters in Delaware courts.

(4) Court interpretation for foreign language speaking and deaf or hearing impaired individuals is a highly specialized form of interpreting that should be per-

---

64. *Woods v. State*, Del.Supr., 695 A.2d 1121 (1997).

65. *Smith v. State*, Del.Supr., 317 A.2d 20, 25 (1974).

66. *See, e.g., 11 Del. C.* § 1447 (possession of a deadly weapon during the commission of a felony) and 11 *Del. C.* § 1447A (possession of a firearm during the commission of a felony).

formed by persons who have specialized training and skills.

(5) Court interpreters act as officers of the court while providing interpretative services and, as a consequence, must abide by ethical considerations to ensure the proper administration of justice.

NOW, THEREFORE, IT IS DIRECT-ED, with the unanimous approval of the members of the Supreme Court, pursuant to Del. Const. Art. IV, 13(1), that:

(1) A certification program should be developed and implemented for court interpreters providing foreign language interpretative services in Delaware, with priority given to certification of court interpreters providing services in the most commonly utilized languages, including Spanish. Towards that end, the Administrative Office of the Courts (AOC) shall explore all options for obtaining access to approved oral certification/proficiency language tests and interpreter training programs being developed through a consortium of states under the auspices of the National Center for State Courts.

(2) The AOC shall develop and maintain a list of qualified court interpreters located in all counties based upon the following criteria: criminal history background evaluations and other background information, including feedback from courts or others who have utilized the interpreter's services, and certification status (once the certification program is implemented). This list shall include sign language interpreters who have registered with the Delaware Registry of Interpreters for the Deaf.

(3) The AOC shall develop a systematic method for recording costs and data related to the use of court interpreters by court and county.

(4) To be included on the list of qualified court interpreters, a court interpreter must complete an orientation session presented by AOC personnel, or demonstrate that he or she has satisfactorily completed comparable training in legal or court interpreting. Orientation sessions will include presentations on the role of the interpreter in the court process, ethical issues related to court interpretation, the structure of the Delaware court and justice system, social and cultural diversity issues and basic legal terminology, among other topics, and will be given on a regular basis. The implementation date of this provision will be six months from the effective date of this Administrative Directive to allow a reasonable time for court interpreters to satisfy this requirement.

(5) Interpreters included on the list maintained by the AOC should be utilized for the provision of interpretative services in court proceedings, unless none of the listed interpreters are willing or available to provide services at the time or date those services are needed by the Court.

(6) To guide the professional conduct of court interpreters, the annexed Code is adopted and promulgated as "The Delaware Court Interpreters' Code of Professional Responsibility".

(7) Each court interpreter employed by the Judiciary to provide interpretative services in connection with a proceeding before any court in Delaware or any other activity ordered by a court or conducted under the supervision of a court shall swear, under oath, that they will comply with the provisions set forth in the Delaware Court Interpreters' Code of Professional Responsibility.

(8) An oath shall be administered to court interpreters providing interpretative services in connection with court proceedings at the commencement of each proceeding, unless the interpreter is a full or part-time court employee. An example of an appropriate oath is: "Do you solemnly swear that you will interpret accurately, completely and impartially, using your best skill and judgment in accordance with the Code of Professional Responsibility for Court Interpreters?" Full or part-time court employees providing interpretative services in court proceedings shall take an

oath once as an oath of office, which shall bind the employee throughout his or her employment with the Judiciary. A notarized copy of the executed oath shall be maintained in the employee's personnel file.

(9) Judicial officers should meet with the court interpreter prior to a court proceeding, or otherwise ensure that the interpreter is familiar with court procedures and legal terminology likely to be used in the proceeding.

(10) Appropriate notice of the role of the court interpreter should be provided to parties and witnesses in court proceedings in which court interpreters are providing services. An example of an appropriate notice is as follows:

I want you to understand the role of the court interpreter. The court interpreter is here only to interpret the questions that you are asked and to interpret your responses. They will say only what we or you say and will not add to your testimony, omit anything you say, or summarize what you say. They are not lawyers and are prohibited from giving legal advice.

If you do not understand the court interpreter, please let me know. If you need the interpreter to repeat something you missed, you may do so.

Do you have any questions about the role or responsibilities of the court interpreter?

(11) Appropriate explanation of the role of an interpreter should be provided to the jury in trials involving juries. An example of an appropriate explanation is as follows:

*Proceedings Interpretation*

This court seeks a fair trial for all regardless of the language they speak and regardless of how well they may or may not use the English language. Bias against or for persons who have little or no proficiency in English because they do not use English is not allowed. Therefore do not allow the fact that the party requires an interpreter to influence you in any way.

*Witness Interpretation*

Treat the interpretation of the witness's testimony as if the witness had spoken English and no interpreter were present. Do not allow the fact that testimony is given in a language other than English affect your view of the witness's credibility.

(12) A standard fee schedule for court interpreters should be adopted once certification/proficiency testing for court interpreters is implemented in Delaware. Interpreters included on the list maintained by the AOC should be paid an hourly minimum, including travel time, as established by the AOC for the provision of interpretive services at court proceedings.

E. Norman Veasey
Chief Justice

## APPENDIX II

## COURT INTERPRETERS
## CODE OF PROFESSIONAL RESPONSIBILITY

**Applicability.** This code shall be binding on all persons employed by the Judiciary to provide interpretative services in connection with a proceeding before any court in Delaware or any other activity ordered by a court or conducted under the supervision of a court or its agent.

Canon 1: **Accuracy and Completeness.** Court interpreters must provide an accurate interpretation of what is said, without altering, omitting or adding anything to what is stated or written, (i.e., epithets or apparent misstatements should be interpreted as well), and without explanations. The role of the interpreter is to provide a simple exchange of question and answers between the questioner and the witness, or party, as if there were no language barrier. However, in the interest of justice, the court may authorize the interpreter to alter or add to what is stated or written in

order to ensure that a party fully comprehends what is occurring during the proceeding.

(A) Interpreters should never characterize or give a gratuitous explanation of testimony and should not interject or reveal their own feelings, moods, attitudes, or beliefs while they are providing interpretative services.

(B) If interpreters do not understand what is being said, they must inform the court and request permission of the court to have the statement repeated or clarified.

(C) If counsel or the court utilize a term or phrase which the interpreters believe may confuse the non-English speaking witness, the interpreter should so inform the court.

Canon 2: **Impartiality.** Court interpreters fulfill a special duty to interpret accurately and faithfully without evidencing any personal bias, avoiding even the appearance of partiality. Interpreters should avoid unnecessary discussions with counsel, parties, witnesses or other interested parties, inside and outside the courtroom.

Canon 3: **Compensation.** Interpreters may accept no remuneration, gifts, gratuities, favors, loans, valuable consideration or other benefits, in excess of the authorized compensation in performance of their official interpreting duties.

Canon 4: **Avoidance of Conflict of Interest.** Interpreters shall disclose any real or perceived conflict of interest or bias, including circumstances in which the interpreter has had any prior involvement wit the case, parties, jurors, or others significantly involved in the proceedings, is a friend, associate or relative of a party or counsel involved in the proceedings or is biased based upon the parties' personal characteristics like race, sex, religion, national origin, disability, age, sexual orientation or socio-economic status. No court interpreter shall render services in a case in which the interpreter has a stake, financial or otherwise, in the outcome.

Canon 5: **Professional Demeanor.** Court interpreters should dress and conduct themselves in a manner consistent with the dignity of the court and shall be as unobtrusive as possible.

(A) Interpreters shall be positioned in the courtroom to ensure that he or she can hear everything that is said during the proceedings, but shall not block the view of, or otherwise interfere with communications between, the judge, jury, parties or counsel.

Canon 6: **Assessing and Reporting Impediments to Performance.** Interpreters shall assess at all times their ability to deliver their services. Prior to the outset of the proceedings and with the knowledge and consent of counsel, the interpreters should briefly interview the non-English speaking person in order to become familiar with speech patterns, communication modes, and linguistic traits of the person. When interpreters have any reservation about their ability to satisfy an assignment competently at any time before or during the proceedings, they shall immediately convey that reservation to the appropriate judicial authority.

Canon 7: **Correction of Errors.** When interpreters perceive that they have committed an error, they shall immediately correct the error for the record.

Canon 8: **Confidentiality.** Court interpreters should not disclose any information of a confidential nature about court cases obtained while performing interpreting duties, except upon court order.

Canon 9: **Restriction of Public Comment.** Interpreters should not publicly discuss, report, or offer an opinion concerning a matter in which they are or have been engaged, even when that information is not privileged or required by law to be confidential.

Canon 10: **Scope of Practice.** Interpreters shall limit themselves to interpreting or translating and shall not give legal

advice, express personal opinions to individuals for whom they are interpreting, or engage in any other activities which may be construed to constitute a service other than interpreting or translating while serving as an interpreter.