**MAZDA MOTOR CORPORATION,
Defendant–Below Appellant,**

v.

**Jenna LINDAHL, Guardian For Megan Noel Lindahl and Jenna Lindahl, individually, Plaintiffs–Below Appellees.**

No. 283, 1996.

Supreme Court of Delaware.

Submitted: Nov. 17, 1997.

Decided: March 3, 1998.

---

11. *Id.*

Douglas B. Cats, and Noel E. Primos (argued), of Schmittinger & Rodriguez, P.A., Dover, for Appellees.

Somers S. Price, Jr. (argued), and Todd L. Goodman, of Potter Anderson & Corroon, Wilmington, for Appellant.

Before VEASEY, C.J., WALSH, HOLLAND, and BERGER, JJ., CHANDLER, Chancellor,* constituting the Court en Banc.

CHANDLER, Chancellor:

Plaintiff-appellee Jenna Lindahl ("Lindahl") filed suit against defendant-appellant Mazda Motor Corporation ("Mazda") alleging that a design defect in Mazda's seat restraint system caused her husband's death. At the close of Lindahl's case-in-chief, and again at the close of all evidence, Mazda moved for a directed verdict contending that Lindahl had failed to offer sufficient evidence that an alleged design defect was a proximate cause of any injuries to decedent. The Superior Court denied both motions. We conclude that Lindahl failed to provide sufficient evidence for the jury to find that the design defect was a proximate cause of any injury. Because Lindahl failed to establish a *prima facie* case, Mazda's motion for a directed verdict should have been granted. We reverse.

*Facts*

On March 17, 1992, a 1986 Mazda 626 driven by decedent Bradley R. Lindahl failed to negotiate a curve on County Route 18 in Little Heaven, Delaware. The vehicle plunged down an embankment, struck the side of a ditch, flipped end over end and

---

* Sitting by designation pursuant to *Del. Const.*, art. IV §§ 12 and 38, and Supreme Court Rules 2 and 4(a).

tumbled through the air, striking the ground several times before it came to a stop 343 feet from the ditch. At trial, Trooper David Weaver testified that at the time of the accident, the asphalt road surface was smooth and dry, and there was no indication that decedent applied his brakes before the car left the road. The speed limit on County Route 18 is 50 miles per hour. According to Lindahl's accident reconstruction expert, decedent was traveling at a speed of at least 55.7 miles per hour. Decedent's blood alcohol content, measured shortly after the accident, was 0.17—well above the legal limit of 0.10. The only witness to the accident testified that he found decedent partially ejected through the driver's side window restrained only by the seat belt that remained buckled across his legs. The death certificate identifies the primary cause of death as exsanguination due to abdominal injuries. Massive head trauma is listed as an additional significant condition that contributed to the cause of death.

Decedent's car was equipped with "yielding" seats designed to cushion an occupant in an accident by collapsing in response to the force of a body thrust against the seat. According to Lindahl,[1] decedent's yielding seats were negligently designed and, as a result, in a rear impact collision the seat back may bend backward, allowing an occupant to slide up the seat back unrestrained by the seat belt. Lindahl alleged that the yielding seat allowed her husband to be partially ejected from the vehicle, causing his death. For the purposes of this appeal, Mazda does not contest the jury's conclusion that the seat was negligently designed. Rather, Mazda appeals the Superior Court's denials of its motions for a directed verdict[2] contending that Lindahl failed to offer sufficient evidence

that the design defect was a proximate cause of any of decedent's injuries, let alone his death.

Lindahl offered the expert opinions of William Sherky, an accident reconstruction expert, and Louis D'Aulerio, a seat design expert, who testified that Mazda's seat design allowed decedent to slide up the seat back and be partially ejected from the vehicle. During Mazda's *voir dire*, D'Aulerio testified that he was neither a biomechanical expert nor an expert in medical treatment.[3] On that basis, Mazda moved to disqualify D'Aulerio from testifying as to the cause of decedent's injuries. The trial court granted the motion.

D'Aulerio later testified that decedent was "partially ejected, out of the vehicle where he then sustained the injury that killed him."[4] Mazda's counsel objected to this testimony as an opinion on the cause of injury, an issue on which D'Aulerio had been declared not competent to testify. The trial court sustained the objection and instructed the jury as follows:

> [m]embers of the jury, the portion of the witness' last answer addressing the causation of any injury or death is stricken. You are to disregard it.[5]

In response to Mazda's first motion for a directed verdict alleging that Lindahl failed to offer sufficient evidence of proximate cause and sufficient evidence of injury enhancement, Lindahl argued that there was a sufficient basis from which the jury could logically and reasonably conclude that the design defect was a proximate cause of decedent's death, even though the Court had disqualified D'Aulerio from testifying as to

---

1. Plaintiffs will be referred to in the singular, although Jenna Lindahl brings this action individually and as Guardian for Megan Noel Lindahl.

2. Under Superior Court Rule 50, amended December 1, 1993, a motion for a directed verdict is now properly referred to as a "motion for judgment as a matter of law." Decisions on both motions are governed by the same legal principles. *See, e.g., Loux v. Advanced Management Concepts, Inc.,* Del.Super., C.A. No. 90C–08–035, Herlihy, J., 1995 WL 790988 (Nov. 14, 1995).

3. Specifically, in response to Mazda's counsel's question if he were "ever qualified as an expert on injury causation in motor vehicle accidents," D'Aulerio responded in the negative, stating that he was not providing testimony relating to biomechanical issues. Trial Tr., Test. of Louis D'Aulerio, June 6, 1996, at 25–26.

4. *Id.* at 91–92.

5. *Id.* at 93.

the timing or cause of decedent's injuries. The Superior Court agreed, stating that:

> [c]ircumstantial evidence, expert testimony or common knowledge may provide a basis from which the causal sequence may be inferred in a particular case. Although expert testimony on biomechanics and greater detail on alternative design may have been helpful here, the Court is satisfied that from the totality of the evidence presented when it is viewed in the light most favorable to the plaintiff that a prima facie case has been established sufficient to allow the case to be presented to the jury.[6]

Mazda then presented its case to the jury. Mazda's medical expert, Dr. Verne Roberts, testified that decedent's death was caused by exsanguination (internal bleeding), that the exsanguination was the result of damage to decedent's liver caused by compression of decedent's liver over the edge of his rib cage when the seat belt was forced against it, and that this compression could have occurred only when decedent was in the seat restrained by the seat belt—i.e., before the defective seat allowed decedent to ramp up the seat back and slip out of the belt.[7] He also testified that decedent's head injuries, eye injury and bruises were caused by contact with objects in the car before the seat defect allowed the seat to recline.[8]

At the close of its case, Mazda renewed its motion for a directed verdict, reasserting its argument that Lindahl had failed to meet her *prima facie* burden on the issue of causation. Mazda further argued that the only evidence regarding causation was Roberts' opinion

that none of decedent's injuries were attributable to the design defect. In response, plaintiff argued that the jury could draw inferences about injury and causation from D'Aulerio's testimony, as well as from common sense and experience. The trial court again denied the motion, ruling that injury causation could be shown through circumstantial evidence and common knowledge as well as through expert testimony.

The jury found that Mazda's and decedent's negligence[9] were proximate causes of decedent's death. Judgment on the jury verdict was entered against Mazda in the amount of $175,000.

### Standard and Scope of Review

This Court's standard of review of a Superior Court ruling on a motion for judgment as a matter of law is "whether the evidence and all reasonable inferences that can be drawn therefrom, taken in a light most favorable to the non-moving party, raise an issue of material fact for consideration by the jury."[10] In other words, we will not disturb a Superior Court ruling denying a motion for judgment as a matter of law where "under any reasonable view of the evidence the jury could have justifiably found for [the non-moving party]."[11]

### Crashworthiness Claims

Lindahl's defective design claim is based upon the "crashworthiness" doctrine, also known as the "second-collision" or "enhanced-injury" doctrine.[12] As presented in

6. Trial Tr., Superior Court Ruling on Defendant's Motion for Directed Verdict, June 11, 1996, at 44.

7. Trial Tr., Test. of Dr. Verne Roberts, June 13, 1996, at 168–170.

8. *Id.* at 170–71.

9. Mazda had earlier moved for a directed verdict that decedent was comparatively negligent because he had been speeding, driving under the influence of alcohol, driving in a careless or inattentive manner, and had failed to drive at a reasonable speed under the conditions—all statutory violations. Trial. Tr., Defendant's Mot. for a Directed Verdict, June 11, 1996, at 171–73. The trial court granted the motion. *Id.* at 177.

10. *Farm Family Mutual Ins. Co. v. Perdue, Inc.*, Del.Supr., No. 416, 1990, at 3, Walsh, J., 1992 WL 21141 (Jan. 2, 1992).

11. *Parks v. Ziegler*, Del.Supr., 221 A.2d 510, 511 (1966).

12. Originally, the term "second-collision" was used to refer to a collision between a human body and an interior portion of an automobile that was caused by an initial collision between the automobile and an external object. *Larsen v. General Motors*, 391 F.2d 495, 502 (8th Cir. 1968). As time passed, use of the term expanded to include secondary collisions such as collisions of an occupant with objects external to the automobile (*Lee v. Volkswagen of America, Inc.*, Okla., 688 P.2d 1283 (1984) (ejected occupant "collid-

the seminal case of *Larsen v. General Motors*,[13] the crashworthiness doctrine is an extension of the general principle that a manufacturer has a duty to design its products to be safe for normal use.[14] In *Larsen*, the Court found that an automobile manufacturer could reasonably expect its products to be involved in accidents and held that the duty to design products to be safe for normal use extended to the situation in which the product was involved in an accident. Thus, "[a]ny design defect not causing the accident would not subject the manufacturer to liability for the entire damage, but the manufacturer should be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design."[15] As manufacturers are responsible for enhanced or additional injuries due only to the defective design (*i.e.*, injuries "over and above" those that would be caused by a non-defective product in an accident), crashworthiness plaintiffs must show that the defective product was the proximate cause of the enhanced injuries—not the proximate cause of the accident itself.

The level of proof of enhanced injury varies by jurisdiction, but two general trends have emerged. The first, following *Huddell v. Levin*, requires a crashworthiness plaintiff to "offer proof of an alternative, safer design, practicable under the circumstances, . . . . offer proof of what injuries, if any, would have resulted had the alternative, safer design been used. . . . [and] offer some method of establishing the extent of enhanced injuries attributable to the defective design."[16] The second, following *Fox v. Ford Motor Co.*[17] and *Mitchell v. Volkswagenwerk, A.G.*,[18] shifts to the defendant the burden of identifying the enhanced injuries due to the defective design, but only *after* the plaintiff has offered some evidence that the injuries were, in fact, enhanced because of the defective product. Regardless of which party bears the burden of identifying specific injuries caused by the defective design, however, *all* crashworthiness cases require the plaintiff to offer some evidence of a causal link between the defective design and the enhanced injuries.[19]

### Proximate Cause

■ Proximate cause is "that direct cause without which the accident would not

---

ed" with street)) and collisions involving other transportation devices (*Nicolodi v. Harley Davidson Motor Co.*, Fla.Dist.Ct.App., 370 So.2d 68 (1979) (motorcycle); *Cleveland v. Piper Aircraft Corp.*, 890 F.2d 1540 (10th Cir.1989) (airplane)). Some "second-collision" or "crashworthiness" claims may also be properly referred to as "enhanced-injury" claims, as when a second-collision is alleged to have enhanced an injury received in the initial accident (*see, e.g., Czarnecki v. Volkswagen of America*, App., 172 Ariz. 408, 837 P.2d 1143 (1991) (second collision alleged to have enhanced "neurologically benign 'Chance' fracture," resulting in paralysis)), although the term "enhanced-injury" also may be an appropriate descriptor for cases not involving transportation accidents or *second* collisions (*see, e.g., Primm v. U.S. Fidelity & Guar. Ins. Corp.*, 324 Ark. 409, 922 S.W.2d 319 (1996) (negligence of school district alleged to have resulted in the fall of an "eggshell" plaintiff from wheelchair, resulting in enhanced injury)). Finally, some "crashworthiness" cases do not involve "second collisions" of the human body with an object. *See, e.g., General Motors Corp. v. Edwards*, Ala., 482 So.2d 1176 (1985) (occupants injured by fire resulting from defective gas tank explosion triggered by crash).

13. 391 F.2d 495 (8th Cir.1968).

14. *See MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916).

15. *Larsen*, 391 F.2d at 503.

16. 537 F.2d 726, 737–38 (3d Cir.1976) (applying New Jersey law).

17. 575 F.2d 774 (10th Cir.1978).

18. 669 F.2d 1199 (8th Cir.1982).

19. *See, e.g., Humphreys v. General Motors Corp.*, 839 F.Supp. 822 n. 7 (N.D.Fla.1993) ("Plaintiffs have failed to show there is any genuine issue of material fact regarding causation. Under these circumstances, whether Plaintiffs bear the extra burden under *Huddell* is moot.") *See also* Heather Fox Vickles & Michael E. Oldham, *Enhanced Injury Should not Equal Enhanced Liability*, 36 S.Tex.L.Rev. 417 (1995); Barry Levenstam & Daryl J. Lapp, *Plaintiff's Burden of Proving Enhanced Injury in Crashworthiness Cases: A Clash Worthy of Analysis*, 38 DePaul L.Rev. 55 (1988); Note, *Apportionment of Damages in the "Second Collision" Case*, 63 Va.L.Rev. 475 (1977); W. James Foland, *Enhanced Injury: Problems of Proof in "Second Collision" and "Crashworthy" Cases*, 16 Wash.L.J. 600, 613–19 (1977).

have occurred." [20] To prove proximate cause a plaintiff must show that the result would not have occurred "but for" defendant's action.[21] There may be more than one proximate cause.[22] To establish proximate cause in a crashworthiness case, the plaintiff must offer evidence that, but for the design defect, the injuries would not have been enhanced.[23] In other words, there must be evidence that the design defect caused injuries *over and above those that would have resulted had the product been properly designed.*

■ In a crashworthiness case, therefore, the burden of showing proximate cause requires a plaintiff to establish that the injuries actually received in an accident with a defective product are greater than the injuries that would have been received in an accident with a non-defective product. Injuries that would have resulted had the product been properly designed, of course, never occurred. A plaintiff will never be able to separate the hypothetical injuries from the total actual injuries received in a crash. But this does not mean that a plaintiff will be unable to prove the extent to which such injuries would have occurred with a non-defective product or even which injuries actually suffered were enhanced by the defective design. Jurisdictions rejecting *Huddell's* strict proof requirements hold that a plaintiff may show proximate cause by establishing the *fact* of enhancement, or *some* evidence of enhancement, and shift to the manufacturer the burden of identifying the specific injuries caused by the defective product. *Huddell* requires the plaintiff to identify the specific injuries that "would have

resulted had the alternate, safer design been used," but also places the additional burden on the plaintiff of providing "some method of establishing the extent of enhanced injuries attributable to the defective design." [24] Under either standard of proof, however, negligence of the manufacturer in *producing* a defective design does not provide a basis for holding the manufacturer liable for *all* injuries suffered in an accident. A manufacturer's defective design provides a basis only for holding the manufacturer responsible for those injuries resulting from the product's defective nature.[25]

■ Thus, the relevant injury in a crashworthiness action is the *additional* injury, if any, that resulted because the product was not as safe as it should have been. Automobile manufacturers do not have a responsibility to guarantee the safety of occupants in a crash. "[A]n automobile manufacturer is under no duty to design an accident-proof or fool-proof vehicle or even one that floats on water, but such manufacturer is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision." [26] All products present a risk of injury in a crash. While these risks cannot be eliminated, they may be minimized. A manufacturer's failure to minimize risks, when it is reasonable to do so, will result in liability for harm caused by the unreasonably dangerous nature of the product. This harm is not measured by the full extent of the injury caused in an accident. It is measured by the *additional* harm inflicted by the product because it presented an un-

20. *Chudnofsky v. Edwards,* Del.Supr., 208 A.2d 516, 518 (1965).

21. *Money v. Manville Corp. Asbestos Disease Compensation Trust Fund,* Del.Supr., 596 A.2d 1372, 1375–77 (1991); *Culver v. Bennett,* Del. Supr., 588 A.2d 1094, 1097 (1991).

22. *Culver,* 588 A.2d at 1097.

23. *General Motors Corp. v. Wolhar,* Del.Supr., 686 A.2d 170, 176 (1996) ("A plaintiff cannot recover unless it is established that the defendants' negligence was the proximate cause of the plaintiff's injuries." (citing *Money,* 596 A.2d at 1375; *Culver,* 588 A.2d at 1097; *Huddell,* 537 F.2d at 737–38, 740)).

24. *Huddell,* 537 F.2d at 737–38.

25. In some of the jurisdictions rejecting *Huddell's* strict proof requirements, however, a manufacturer's *failure to identify the specific enhanced injuries* resulting from the defective nature of the product—following the plaintiff's proof of enhancement in general—may result in the manufacturer's liability for *all* injuries suffered in the accident. *See General Motors Corp. v. Edwards,* Ala., 482 So.2d 1176, 1190 (1985).

26. *Larsen,* 391 F.2d at 502.

reasonable risk of injury—*i.e.*, that harm over and above the harm that the accident would have caused had the product been properly designed.

### How to Show Proximate Cause in a Crashworthiness Case

The issue of proximate cause is almost always a question for the jury. In order for the proximate cause issue to reach the jury, however, it must be supported by some degree of evidence. A reasoned decision on the question of proximate cause may require understanding and analysis of issues beyond the ken of the typical jury. In such a case, the absence of expert testimony will prevent the issue from ever reaching the jury.[27]

The question of proximate cause in this case is the question of which factors were the proximate cause of the decedent's *enhanced* injuries. Decedent's injuries resulted from an automobile accident occurring at a high rate of speed and involving numerous flips and turns of the automobile end over end for over 300 feet, ending—possibly due to a defective seat restraint system—in the death of the driver. Lindahl contends that the seat design testimony, along with the circumstantial evidence, provided a suffi-

cient basis for the jury to infer that the design defect was the proximate cause of the enhanced injuries, *i.e.*, in this case, death. The forces of this accident upon decedent and the corresponding injuries they would produce, however, are not subjects with which the members of a jury are familiar.[28] Thus, the jurors required the assistance of expert testimony in order to reach a reasoned conclusion on the issue of proximate cause.[29]

### Has Lindahl Offered Sufficient Evidence of Proximate Cause?

Lindahl introduced no evidence linking the design defect to the specific causes of death identified on the death certificate. She presented no evidence connecting the seat collapse or the partial ejection to the abdominal injuries or the head trauma—the known causes of death. Nor did she assert that death was caused by factors other than those identified in the death certificate. In fact, the only expert testimony Lindahl presented was that of her seat design expert, D'Aulerio, who had been disqualified from testifying on matters of causation. Without any evidence of causation, the jury was forced to speculate as to how the seat defect may have caused the specific injuries resulting in death.[30]

---

**27.** *Money,* 596 A.2d at 1375.

**28.** *Compare Money,* 596 A.2d at 1377–78 (causation of asbestos-related disease not a matter of common knowledge, therefore plaintiff required to provide expert medial testimony); *Laskowski v. Wallis,* Del.Supr., 205 A.2d 825, 827 (1964) (permanency of injuries may not be proven absent expert medical testimony) with *Chudnofsky,* 208 A.2d at 518 (trial court's conclusion that plaintiff's negligence was proximate cause of automobile accident was "warranted, under the facts, upon considerations of logic and common sense as well as justice and precedent" even though record lacked direct evidence that had plaintiff not been negligent the accident could have been avoided); *Horn v. General Motors Corp.,* 17 Cal.3d 359, 131 Cal.Rptr. 78, 82, 551 P.2d 398, 402 (1976) (sufficient evidence offered for jury to conclude that absence of "horn cap" covering exposed prongs caused greater damage to plaintiff than would have been caused with cap in place, even though plaintiff offered no evidence of the specific injuries that would have occurred if the horn cap had been present).

**29.** *Accord Curtis v. General Motors Corp.,* 649 F.2d 808 (10th Cir.1981). In *Curtis,* the Court

held that proof of the factors causing plaintiff's injuries in an accident in which plaintiff was tossed around inside an automobile before coming to rest partly outside of the vehicle required expert testimony.

> It is apparent that the nature of the injury here sued upon creates unusual problems of proof at best. Expert testimony is required in order for the jury to avoid pure speculation, or a conclusion arising from plaintiff's position after the accident but with no causal connection to the injury established by anyone's testimony.

*Id.* at 813.

**30.** The jury would be faced with many questions. Were the specific injuries caused by the decedent's ramping up and hitting his head on the interior roof or internal structure of the car? Were the specific injuries inflicted as decedent was partially ejected out the window? Were the specific injuries received after he was partially ejected, *e.g.*, by the roll of the car? Did the only witness aggravate what would have been survivable injuries in the process of removing decedent from the car?

Lindahl contends that she has provided sufficient evidence of causation by establishing the *fact* of enhancement—*i.e.*, that decedent would not have died were it not for the defective seat design. Lindahl argues that her evidence proved that had decedent's car not contained a defective seat, decedent would have survived the crash. By implication, according to Lindahl's theory, the defective seat *must* have caused decedent's death.

In support of her "survivability" argument—*i.e.*, that decedent would have survived had the seat been properly designed—Lindahl contends that "D'Aulerio's testimony that had the Decedent remained in the restraint system he would have survived the crash provided a sufficient basis for the jury to conclude that the Decedent would have survived the crash but for defendant's negligent design."[31] In this vein, Lindahl points to D'Aulerio's testimony that decedent was in the driver's seat and properly restrained by the seat when the vehicle first hit the ditch, but that the later impact from the vehicle's landing on its rear caused the seat to recline backward allowing decedent to slip past the shoulder harness and slide up the back of the seat.[32] Moreover, D'Aulerio stated "that had he had a properly designed seat, a stronger seat, he would have remained in a seated position and he would not have been thrown out of the vehicle."[33] Finally, D'Aulerio testified that if decedent had stayed in his seat "given the height and size of Mr. Lindahl and the space available to him, there was sufficient space left for him to essentially have what we call survivable space, meaning enough space to survive the accident without serious injury. There would have been a lot of minor injuries, but I would not have expected any serious or fatal injuries."[34]

Although he made the unsupported statement that there would have been survivable space, putting aside the question whether he was even qualified to testify on such matters, D'Aulerio never stated that decedent would have survived the physiological forces on his body had an alternate, safer seat been employed. D'Aulerio offered no opinion as to the nature of the injuries that would have been inflicted on the occupant of a vehicle with a properly designed seat.[35] Thus, he failed to provide any basis from which the jury could conclude that an accident with an alternate seat design was survivable. Even if Lindahl's "survivability" argument would have been sufficient to establish the design defect as a proximate cause of decedent's fatal injuries, D'Aulerio's testimony failed to provide evidence to support such an argument. As there was no other expert testimony supporting the conclusion that the design defect was a proximate cause of any of decedent's injuries, Lindahl failed to establish a *prima facie* case.[36]

The *Huddell* Court itself faced a somewhat similar situation, involving the survivability of an accident. In *Huddell*, the driver of a car that ran out of gas on the Delaware Memorial Bridge was killed when

31. Pls.' Ans. Br. at 20–21.

32. Trial Tr., Test. of Louis D'Aulerio, June 10, 1996, at 20, 26; Trial Tr., Test. of Louis D'Aulerio, June 6, 1996, at 42.

33. Trial Tr., Test. of Louis D'Aulerio, June 6, 1996, at 93.

34. *Id.* at 42.

35. Although there was testimony that an alternate, stronger, seat design was available, and Mazda does not challenge the jury's finding that the seat was negligently designed, no evidence exists for D'Aulerio's statement that an alternate design would have allowed decedent to survive *this* crash. Without this supporting information, the jury was forced to speculate whether an alternate seat would have remained upright and

whether, as a result of remaining upright, decedent or other parts of the seat restraint system would have been subject to excessive forces, resulting in decedent's leaving the system or incurring other, possibly fatal, injuries from the vehicle's internal structure.

36. In point of fact, however, even with better evidentiary support, Lindahl's "survivability" argument would not have been sufficient to establish the design defect as a proximate cause of decedent's enhanced injuries. Ultimately, this argument fails to recognize that the defective nature alone cannot provide a basis for holding the manufacturer responsible for *all* the injuries suffered in an accident involving a defectively designed product. Whether facing a *Huddell* jurisdiction, or a jurisdiction rejecting *Huddell*, a crashworthiness plaintiff must, at the very least, establish that the *enhanced* injuries were caused by the defectively designed product.

his car was hit from behind by a second driver traveling between 50–60 miles per hour. The impact caused the stopped car to accelerate to over 30 miles per hour, causing Dr. Huddell's head to strike his head rest at ten miles per hour. Plaintiff alleged that the accident would have been survivable had the head rest been designed to distribute force over a wider area. As designed, the head rest contained a metal piece in the shape of "an airplane wing, with the front 'ax-like' portion aimed directly at the rear of the head."[37] The *Huddell* Court noted that plaintiff's expert failed to identify the specific types of injury that would have resulted had the head rest been designed differently.

> [T]he record does not indicate the specific meaning of the term "survivable", and there is no testimony as to the extent of the injuries, if any, which would have resulted in a survivable crash. Although Dr. Geikas testified that there was no evidence of significant injury to vital organs from the accident as it happened, this ignored the possibility that injury to those organs might have been more severe if the great forces of the collision had been more widely distributed over the head and body by an alternate head restraint design. It was not established whether the hypothetical victim of the survivable crash would have sustained no injuries, temporary injuries, permanent but insignificant injuries, extensive and permanent injuries, or, possibly, paraplegia or quadriplegia.[38]

Lindahl asserts that the *Huddell* Court's conclusion was based on the Court's requirement that plaintiff (rather than defendant) bear the burden of identifying the specific injuries that occurred because of the defective design. Certainly, the failure to apportion the injuries was a concern of the Court given the specific proof requirements it had established. As in this case, however, the plaintiff in *Huddell* had clearly failed even to meet the threshold requirement of establishing what injuries would have been caused by a properly designed product. Without proof of the injuries that would have been caused by a non-defective product, the plaintiff in

*Huddell* could not possibly establish the injuries that actually were inflicted on Dr. Huddell because of the defective product. We likewise reject Lindahl's "survivability" argument, not because we hold that a plaintiff always bears the burden of identifying the specific injuries caused by the defect (a decision we do not now reach), but *because Lindahl has failed to offer sufficient evidence of the injuries that would have occurred had there been a properly-designed seat.* Without this evidence, it would be impossible to prove that the defect was a proximate cause of any enhanced injuries. Thus, Mazda's motion for a directed verdict should have been granted.

## Conclusion

The judgment of the Superior Court, denying Mazda's motion for a directed verdict is

REVERSED.

---

**37.** *Huddell,* 537 F.2d at 735.

**38.** *Id.* at 738.