BELL SPORTS, INC., a foreign corporation, Defendant Below, Appellant,

v.

Brian J. YARUSSO, Plaintiff Below, Appellee.

No. 187, 1999.

Supreme Court of Delaware.

Submitted: June 6, 2000.
Decided: Sept. 7, 2000.
Rehearing Denied Sept. 28, 2000.

Kathleen M. Miller, Smith, Katzenstein & Furlow, LLP., Wilmington, Delaware, R. Benjamin Reid, Wendy F. Lumish, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Miami, Florida, for appellant.

Bartholomew J. Dalton, Brandt & Dalton, P.A., Wilmington, Delaware, Larry E. Coben, Coben & Associates, Scottsdale, Arizona, for appellee.

Before VEASEY, Chief Justice, WALSH and HOLLAND, Justices.

WALSH, Justice:

This is an appeal from a Superior Court denial of judgment as a matter of law, or alternatively, for a new trial following an award of damages in a product liability action. The defendant-appellant claims error on the part of the trial judge in ruling on the qualifications of plaintiff's expert witnesses and in permitting the substance of that testimony to establish a jury question on claims for breach of warranty. The appellant further asserts that the jury verdict was internally inconsistent and that the Superior Court should have declared a mistrial after discharging a juror for cause during trial. Upon careful review of the record, we conclude that the Superior Court did not abuse its discretion in permitting the testimony of plaintiff's experts nor in submitting the issues of breach of warranty to the jury. We further conclude that the jury's verdict did not lack consistency and that the refusal to grant a mistrial was not error.

1. "Off-road" motorcycles are equipped with motors, tires, seats and suspension components specifically designed to function effectively under adverse riding conditions typical of motocross tracks, woods and fields. They are generally much lighter in weight than motorcycles designed for street use, have a higher degree of suspension clearance/compliance and are usually not equipped with horns, lights and other features required for legal street operation.

2. Dr. Joseph Cusick, a neurosurgeon, described Yarusso's specific injuries. He testified that Yarusso's C5 vertebral body

## I

On October 20, 1991, Brian J. Yarusso ("Yarusso"), then 22 years of age, was riding his off-road motorcycle[1] at a dirt motocross track located off Church Road in Newark, Delaware. Yarusso was wearing a full complement of safety equipment in addition to the helmet that is the subject of this dispute. While traveling over a series of dirt moguls, or bumps, Yarusso hit one of the moguls in such a way that he was catapulted over the handlebars of the motorcycle. He landed on his head, flipped over and came to rest face down in the dirt. As a result of his fall, Yarusso sustained a burst fracture of the C5 vertebral body and was rendered a quadriplegic.[2]

Yarusso filed suit in the Superior Court against Bell Sports, Inc. ("Bell"), the manufacturer of the Bell Moto 5 helmet he was wearing at the time of the accident. Yarusso's suit against Bell was predicated on a claim that the enhanced injuries he suffered were the proximate result of a defect in the helmet's design. The Bell Moto–5 is a full-face motocross helmet that was designed for off-road use. It complies with federal Department of Transportation ("DOT") standards and is also certified by the Snell Foundation, a leading worldwide helmet research and testing laboratory.[3] The helmet is constructed of a fiberglass outer shell, an inner crushable liner, and a retention system consisting of a chinstrap and D-ring pull-tab. While all three of these components are designed to interact,

sustained major damage due to a "severe axiocompression load, usually ... without much extension or flexion." The magnitude of the load was sufficient to crack the bone, push the spinal disk into the soft bone, and "explode" the disc into the spinal cord and some of the other disks.

3. A motorcycle rider's helmet must have DOT certification in order to participate in any races sanctioned by the American Motorcycle Association ("AMA"). The AMA also recommends the use of a Snell-certified helmet.

the inner liner is considered the most important safety feature of the helmet. The expanded polystyrene material of which this liner is primarily constructed is designed to compress upon contact with a solid object.

Yarusso's complaint contained alternative grounds for recovery. He alleged negligence in the design and construction of the helmet, breach of express warranties and breach of an implied warranty of merchantability. Yarusso's express warranty claim arose from specific textual representations in the helmet's accompanying owner's manual (the "manual"), the relevant portions of which are as follows (emphasis printed in manual also reproduced below):

> *Five Year Limited Warranty:* Any Bell helmet found by the factory to be defective in materials or workmanship within five years from the date of purchase will be repaired or replaced at the option of the manufacturer, free of charge, when received at the factory, freight prepaid.... This warranty is expressly in lieu of all other warranties, and any implied warranties of merchantability or fitness for a particular purpose created hereby, are limited in duration to the same duration as the express warranty herein. Bell shall not be liable for any incidental or consequential damages....
>
> *Introduction:* Your new Moto–5 helmet is another in the long line of innovative off-road helmets from Bell.... (T)he primary function of a helmet is to reduce the harmful effects of a blow to the head. However, it is important to recognize that the wearing of a helmet is not an assurance of absolute protection. **NO HELMET CAN PROTECT THE WEARER AGAINST ALL FORESEEABLE IMPACTS.**
>
> *Helmet Performance:* The Moto–5 is designed to absorb the force of a blow first by spreading it over as wide an area of the outer shell as possible, and second by the crushing of the non-resilient inner liner. Damage to the helmet after an impact is not a sign of any defect in the helmet design or construction. It is exactly what the helmet is designed to do.
>
> **NOTICE: No helmet can protect the user from all foreseeable impacts. To obtain the maximum protection offered by any helmet, it must fit firmly on the head and the chinstrap must be securely fastened.**

Yarusso testified at trial that he purchased this particular helmet based on the specific assertions, quoted above, that "(t)he primary function of a helmet is to reduce the harmful effects of a blow to the head."

Yarusso's implied warranty of merchantability claim arose out of his contention that the helmet was not merchantable because it was sold as an off-road helmet but was designed to function for "on-road" use. Because the helmet met DOT street helmet standards, Yarusso claimed that it was actually designed with a very stiff liner that would effectively function for on-road use but would not protect a rider against foreseeable off-road falls, where the impact surface could conceivably be softer.

A pivotal factual issue at trial was whether the helmet liner properly crushed, as designed, at the time Yarusso's head impacted the ground after his fall. Yarusso claimed that the injuries to his neck were caused by the stiffness or density of the liner material at the helmet crown. At trial, he offered expert testimony by Maurice Fox ("Fox"), a safety consultant who had been employed by a helmet manufacturer during the 1970's. Fox opined that Yarusso's helmet sustained the majority of the fall's impact at its crown where the liner was too dense to crush sufficiently, thereby transmitting excessive force to Yarusso's neck, resulting in his paralysis. Fox's testimony however, was directed primarily at Yarusso's negligence claim against Bell, which the jury subsequently rejected.

Joseph Cusick, M.D. ("Cusick"), a neurological expert, similarly testified that the

neck injuries sustained by Yarusso were consistent with impact at the top, or crown, of the helmet. Cusick further testified that a 20–30% reduction of force to Yarusso's body would have been sufficient to avoid injury because his body would have been able to withstand this lower level of force.

Richard Stalnaker, Ph.D. ("Stalnaker"), a biomechanical engineer, also testified on behalf of Yarusso and largely affirmed Fox's opinion. His testimony was crucial in the jury's determination that Bell had breached express and implied warranties. Stalnaker determined that the force of Yarusso's impact with the ground was equivalent to 60 foot pounds, and that adequate crush of the helmet liner would have reduced it significantly to avert injury. Although Stalnaker modified the analytical process used to reconstruct the accident to coincide with that presented by Bell's expert reconstruction witness at trial, Bell's counsel rejected an opportunity to delay the trial and requested only a mistrial. Because the trial judge determined that the factual foundation for Stalnaker's testimony was unchanged despite his use of an alternative analytical, she denied the motion for mistrial leaving the matter for attack through cross-examination.

Bell offered its own expert testimony at trial disputing the helmet's point of impact from the accident and asserting the inability of any helmet to protect its user from severe neck injuries. The principal designer of the helmet, James Sundahl ("Sundahl"), testified that any helmet must be designed to protect its user from a multitude of accident types. He further opined that in circumstances involving a helmet's impact with a soft surface, the surface itself, rather than the helmet, absorbs a greater portion of the energy. When questioned about the representation in the helmet's manual, Sundahl testified that it was "wrong."

James McElhaney, Ph.D. ("McElhaney"), a professor of biomechanics at Duke University, testified for Bell and disputed Yarusso's contention that the helmet was impacted at its crown. McElhaney testified that the front of Yarusso's helmet liner was crushed in a fashion indicating a substantial blow to that area. Both Sundahl and McElhaney presented evidence of industry-wide research to the effect that no helmet can offer "any significant protection of the neck because the mass of the torso is so much more than the energy levels that a helmet can manage." Bell's experts claimed that this helmet and helmets in general are designed to protect users from head and brain injuries and the helmet in this case did precisely that.

Upon the conclusion of Yarusso's case, he abandoned his failure to warn claim. At the close of all the evidence, Bell moved for judgment as a matter of law as to liability. The trial court granted judgment as a matter of law on Yarusso's breach of implied warranty for a particular purpose claim, but denied Bell's motion on the remaining counts. The jury was then charged on the remaining claims of negligence, breach of implied warranty of merchantability and breach of express warranty.

On the second day of jury deliberations, one juror notified the trial court that he had reviewed outside information regarding motorcycle helmets in connection with securing a motorcycle licensing examiner's certificate. The jury also notified the court that they were deadlocked. The trial judge subsequently interrogated the juror who had disclosed his outside knowledge out of the presence of the remaining jurors. The trial judge determined that while the juror had not yet shared this extraneous information with other jurors, he had violated the direct instruction to decide the case solely from the evidence presented. The trial judge dismissed the juror prompting a motion from Bell for a mistrial, which was denied. Because both parties had agreed at the outset of the trial to accept a jury of eleven members, the remaining jurors were permitted to deliberate.

Through specific answers to interrogatories, the jury ultimately found that Bell was not negligent, but had breached an express or implied warranty, which proximately caused Yarusso's enhanced injury. Yarusso was awarded $1,812,000 in damages. Bell objected that the verdict was inconsistent and renewed its motions for judgment as a matter of law or alternatively for a new trial on liability only, all of which were denied by the Superior Court. This appeal followed.

## II

■■■ This Court's standard of review from a ruling on a motion for judgment as a matter of law is whether under any reasonable view of the evidence, the jury could have justifiably found for the non-moving party. *See Mazda Motor Corp. v. Lindahl,* Del.Supr., 706 A.2d 526, 530 (1998). The Court reviews a trial court's decisions to admit evidence and/or deny a motion for a new trial under an abuse of discretion standard. *See Young v. Frase,* Del.Supr., 702 A.2d 1234, 1236 (1997).

Bell contends that the critical element in this case, whether the helmet was defective, was based on Yarusso's claim that it failed to protect his neck when thrown from the motorcycle even though he received no head injuries. Bell asserts that Yarusso's ability to prove this claim rested entirely on the expert testimony of Fox and Stalnaker, and that the trial court abused its discretion in finding Fox and Stalnaker qualified and in further determining that their testimony was not "new science", thereby precluding an analysis under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Bell claims that an independent *Daubert* analysis is required, as a matter of law, prior to the admission of any expert testimony. Because Yarusso presented no other testimony that a helmet could protect a neck from injury, the

argument goes, the trial court's error cannot be considered harmless and the verdict was improper as a matter of law.

Bell further contends that had the trial court conducted a *Daubert* analysis, allowing the introduction of Fox and Stalnaker's testimony would have constituted a "gross" abuse of discretion. First, Bell submits that the testimony was not properly based on accepted scientific protocol. Fox's testimony, it claims, did not reflect scientific knowledge because his assertions were made following the use of tests suggested to him by Yarusso's counsel, neither of which was derived by scientific methodology.[4] Stalnaker's use of football helmet protocol to demonstrate how a helmet could protect its wearer's neck, Bell claims, was methodologically flawed and yielded an opinion not based on facts reasonably relied on by experts in the field.

Bell argues that Yarusso's expert testimony is also barred based on its alleged origin in theory that has not been generally accepted by the scientific community. Bell contends that neither Fox, who worked in the helmet industry in the 1970's and early 1980's, nor Stalnaker, who has never worked for a helmet company, is aware of current scientific opinion that a helmet cannot offer significant neck protection. Bell further notes that neither expert offered independent proof from the scientific community, in the form of peer review, of their unpublished theory's acceptance and viability.

Yarusso counters that Fox and Stalnaker were both properly qualified and their testimony was competent and, therefore, admissible. With over 21 years of experience in the helmet industry, much of which involved testing and studying the safety performance of helmets, Yarusso argues that Fox is eminently qualified to offer expert testimony. He notes that Fox con-

---

4. Bell points to two tests performed by Fox. One test confirmed that the denser the helmet's liner, the greater the force necessary to crush it. The other found that the ground absorbs the energy on impact into soft earth regardless of the density of the liner.

tinues to work with the helmet industry and serves as an expert consultant to several helmet companies. Yarusso claims that Bell's contention that Fox's experience is outdated is unfounded since the principles of physics upon which the helmet's shell and liner were studied have not changed.

Yarusso argues that Stalnaker's general credentials too are impeccable, sufficiently so that Bell chose not to challenge them. Stalnaker's decision to use a football helmet protocol in his testing was mandated, Yarusso contends, by the absence of a testing standard applicable to off-road helmets. Moreover, because his research determined that the helmet's liner was too stiff to properly deform within the protocol standards from this accident, testing under more severe DOT or Snell standards was rendered unnecessary. Similarly, because the helmet's damage in this case was centralized at its crown and was sustained following impact with a soft surface (dirt), Stalnaker was forced to use alternative testing methods to yield accurate results. Yarusso argues that reliable techniques or methodology that aid the decision making process are admissible, even if they have "certain flaws."

Yarusso also takes issue with Bell's conclusion that the scientific community has rejected the notion that a helmet can provide protection for the neck. Given the specific circumstances from his accident, whereby the weight of his torso did not fully "load" the neck, Yarusso postulates that the scientific community would generally agree that a properly designed helmet could provide an adequate measure of safety. Stalnaker offered testimony that testing and research has been conducted by other scientists in the industry in support of a theory that helmets can, in specific instances, protect users from neck injuries. Thus, Yarusso contends that the specific facts of this case required its experts to use alternative testing methods and make references to other helmet designs, both of which were based on accept-ed scientific principles permitting further consideration by a fact-finder at trial.

Delaware Rule of Evidence 702 governs the admission of expert witness testimony. It provides, "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." D.R.E. 702 is identical to Federal Rule of Evidence 702 ("F.R.E. 702") and has been interpreted by the United States Supreme Court, in *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786, to obligate a trial judge to "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Daubert* further identifies certain factors for the trial judge to consider in performing a "gatekeeper" function, including testing, peer review, error rates and acceptability in the relevant scientific community, some or all of which might prove helpful in determining the reliability of a particular scientific theory or technique. 509 U.S. at 597, 113 S.Ct. 2786.

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court extended the gatekeeping obligation of the trial judge to apply to all expert testimony on "scientific, technical or other specialized" matters. The Supreme Court's holding in *Kumho Tire* also reaffirmed *Daubert's* description of the trial judge's F.R.E. 702 inquiry as "flexible" and not requiring "a definitive checklist or test," but clarifying that it must be "tied to the facts" of a particular case. *Id.* at 150, 119 S.Ct. 1167. The Court further concluded that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." 526 U.S. at 152, 119 S.Ct. 1167.

*Daubert* and *Kumho Tire* were decided by the U.S. Supreme Court in its federal supervisory role, and its interpretation of

F.R.E. 702 is binding only on lower federal courts. In *M.G. Bancorporation, Inc. v. Le Beau,* Del.Supr., 737 A.2d 513 (1999), this Court expressly adopted the holdings of *Daubert* and *Kumho Tire* as correct interpretations of D.R.E. 702. *Le Beau,* however, was not decided until approximately one year after the ruling presently under consideration. Indeed, the U.S. Supreme Court had not yet decided *Kumho Tire* at the time the Superior Court passed upon the qualification of Fox and Stalnaker.

The issue of Fox and Stalnaker's qualification as experts was the subject of *in limine* hearings and a substantial pretrial record generated by the parties on Bell's claim that they lacked the necessary expertise to give opinions on the relationship between helmet design and injury causation. Before Fox was called to testify at trial, counsel for Bell prefaced his objection to Fox's testimony by noting that counsel's position had already been presented in "our memo that the Court has had." The essential objection to Fox was that while he had experience in helmet testimony his experience with the particular helmet in question was limited and in any event Fox had not offered "any alternative design." Fox's expertise was defended by Yarusso's counsel who noted that Fox was "associated with a variety of helmet testing laboratories over the years" and is intimately familiar with how helmets are designed for usage on road and off road. The Superior Court questioned Yarusso's counsel about whether the opinion of alternative design was intended to show that there should have been a "more resilient, more readily compressible material." After this colloquy, the trial judge overruled the objection noting that *Daubert* dealt with new science and, in any event, alleged limits in Fox's helmet testing could be explored in cross-examination.

With respect to Stalnaker, again there was an *in limine* effort to exclude his testimony and later at trial an objection was made that Stalnaker changed the foundation for his testimony. The court specifically rejected that claim.[5]

The Superior Court amplified upon Bell's objection to the testimony of Fox and Stalnaker in its post-trial rejection of Bell's motion for a new trial.

Fox's testimony ... was directed primarily at the plaintiff's negligence case. I was satisfied that his qualifications were sufficient on the basis of his education and experience to permit him to testify. The weight to be given to his testimony was left to the jury. Since the jury did not find in the plaintiff's favor on the negligence charge, Fox's testimony is of little consequence.

Stalnaker's testimony was pivotal. It was he who testified that the force of the accident was 60 foot pounds, and that the crush of the liner would have reduced it sufficiently to avert injury. The deposition testimony of Stalnaker had been taken prior to trial. He apparently had developed his own accident reconstruction analysis, working backward from his assessment of the kind of force needed to produce the injury. He concluded that the force was 60 foot pounds. At the time of trial, he rejected his own reconstruction and relied upon the reconstruction of plaintiff's reconstruction expert, Newbold, who had reached the same conclusion, though through a different analytical process. When the change in the foundation of the Stalnaker testimony came to light, the defendant was offered the opportunity to suggest a remedy, such as a delay in the trial, so he could react to the change. No remedy was requested, except a mistrial. Since the foundation fact for Stalnaker's testimony was unchanged although the analysis getting to

---

5. The court stated: "I don't buy because he has demonstrated—now, whether you agree with him or not he's got sufficient experience and education to understand the physiology of injury, and I'm content that's—that he's met the criteria."

that fact was different, I concluded in the exercise of my discretion that a mistrial was not appropriate. Furthermore, the defense vigorously cross examined Stalnaker on that change in his testimony in an attempt to challenge his credibility and competence.[6]

Because this Court's approval of the *Daubert/Kumho Tire* approach for deciding disputed issues under D.R.E. 702 was not promulgated at the time of trial in this case, the Superior Court's ruling on admissibility cannot be tested by the later-enacted standard.[7] The Superior Court ruling was consistent, however, with the Court's decisional standards then in effect. Since the adoption of the Delaware Rules of Evidence in 1980, this Court has recognized that opinion evidence may be offered if an expert's education, training or general experience demonstrates sufficient knowledge of general principles, even if the expert does not have particular experiences with the exact issue under examination. *See e.g. Yankanwich v. Wharton,* Del.Supr., 460 A.2d 1326, 1329–30 (1983) (personal observation and experience may provide basis for expert opinion on accident reconstruction by police officers); *DiSabatino Bros, Inc. v. Wortman,* Del. Supr., 453 A.2d 102, 106 (1982) ("[A]n experienced practicing physician is an expert, and it is not required that he be a specialist in the particular malady at issue in order to make his testimony as an expert admissible."). If scientific issues are implicated in the expert's conclusion, in-depth experience in the underlying scientific principles is required of the expert. *See State v. Ruthardt,* Del.Super., 680 A.2d 349, 361 (1996) (cited with approval in *Zimmerman v. State,* Del.Supr., 693 A.2d 311, 314 (1997)).

Under the standards of admissibility for expert testimony then in effect, we are satisfied that the Superior Court, after full *in limine* hearings, did not abuse its discretion in permitting the expert testimony of both Fox and Stalnaker. Those hearings and the written submission of the parties permitted the trial judge to gauge the competing positions of the parties concerning the expertise of the proposed witnesses, their familiarity with the underlying scientific principles and the relevance of their opinion to the disputed issues.

With extensive experience in the helmet industry, much of which involved testing and studying the safety performance of helmets, Fox is qualified to have offered expert testimony, as the Superior Court determined. At the time of trial, Fox was continuing to serve as an expert consultant to several helmet companies. The underlying principles of physics upon which the helmet's shell and liner were studied in this case have not changed over time. Moreover, as the Superior Court noted in its post-trial ruling, Fox's testimony was directed primarily to the theory of negligent design—a premise rejected by the jury in fixing liability on the warranty claims alone.

At trial, Bell did not directly contest Stalnaker's qualifications as an expert but sought to strike his testimony because he allegedly changed his own accident reconstruction theory in favor of that advanced by another of the plaintiff's experts. The sole remedy sought by Bell at trial in this regard was the grant of a mistrial. The Superior Court had discretionary authority to grant Bell a range of remedies from a delay in the trial to a mistrial. Under the circumstances, since Stalnaker's basic scientific analysis did not change and his qualifications were not di-

---

**6.** *Yarusso v. Bell Sports, Inc.,* Del.Super., C.A. No. 93C–10–132, slip. op. at 21–22, 1999 WL 463531 (April 1, 1999).

**7.** Nor can the Superior Court's ruling on admissibility be tested by the stringent standards promulgated by other federal decisions imple-

menting *Daubert* relied upon by Bell. *See e.g. Goebel v. Denver and Rio Grande W.R.R. Co.,* 10th Cir., 215 F.3d 1083, 1088 (2000) (holding that *Daubert* findings must be made specific on record).

rectly at issue, the Superior Court did not abuse its discretion in denying Bell's motion for mistrial.

Finally, we conclude that the Superior Court was correct in noting that the underlying scientific dispute over the helmet's ability to withstand impact was not "new science" in the sense that the expert evidence on either side offered scientific theory in a previously unexplored area. As the record indicates, the helmet industry has for years conducted continuous testing of helmets of all types, including off-road helmets. While *Kumho Tire's* teaching, as adopted by this Court in *LeBeau*, obviously extends *Daubert's* analysis for admissibility to all scientific evidence, the Superior Court's ruling did not depend for its validity on whether it was required to follow a "new scientific" analysis or not. In the final analysis, the correctness of the Superior Court's ruling must be viewed from the appellate standard of whether the trial court abused its discretion.[8]

We find no abuse of discretion on the part of the lower court in this case. A substantial pretrial record was generated, most of which contained expert testimony and opinion evidence presented by both parties. A review of those records afforded the trial judge the opportunity to determine the experts' qualifications and the reliability and relevance of their testimony. The trial judge found both Fox and Stalnaker to be properly qualified to offer expert testimony by their knowledge, skill, experience, training and/or education.

Fox's testimony was allowed based on his years of experience in the helmet industry and knowledge of its products.

Stalnaker, a respected physicist, offered opinions predicated on his performance of a variety of tests that appear both sufficiently based on scientific methodology and specifically related to the circumstances of Yarusso's accident. As permitted by D.R.E. 702, their testimony served to assist the jury to understand the evidence and determine facts. Yarusso's experts were subjected to rigorous cross-examination, a safeguard recognized in *Daubert*.[9] The trial judge also permitted Bell's experts to present competent evidence to counter Yarusso's claims. The jury apparently found Yarusso's expert and opinion testimony more convincing, but that result does not require a heightened standard of review by this Court of the criteria governing the admissibility of the expert testimony it favored.

For these reasons, we conclude that the Superior Court did not abuse its discretion in permitting the expert testimony tendered on behalf of Yarusso after having determined the witnesses to be qualified by education, experience, and their opinions relevant to the issues in dispute.

### III

By its verdict, the jury specifically determined that Bell did not negligently design the Moto–5 helmet but that Bell breached "an express or implied warranty" when it sold the helmet and that "conduct proximately caused Brian Yarusso to suffer enhanced injuries." Bell argues on appeal that Yarusso failed, as a matter of law, to establish an evidentiary basis for recovery under either express or implied warranty and the trial court should have

---

8. While this Court's adoption of the *Daubert/Kumho Tire* analysis also incorporated an abuse of discretion test for appellate review of a trial court's ruling and D.R.E. 702, prior Delaware decisional law was equally deferential. *See Robelen Piano Co. v. DiFonzo*, Del. Supr., 169 A.2d 240, 246 (1961).

9. As the Supreme Court noted in *Daubert* (addressing concerns that abandonment of *Frye's* [*v. U.S.*, 293 F. 1013 (App.D.C.1923)] general acceptance standard will result in ad-

missibility of "pseudoscientific assertions"), "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596, 113 S.Ct. 2786. See also, to the same effect, *Barriocanal v. Gibbs*, Del.Supr., 697 A.2d 1169, 1173 (1997) (citing *Daubert* and *State v. Cephas*, Del.Supr., 637 A.2d 20, 28 (1994)).

granted judgment in its favor as to those claims.

Preliminarily, we note that the jury was permitted to find liability under alternative forms of breach of warranty, express or implied, without differentiating between the two.[10] Bell did not object to the warranty claims being submitted in that format and, thus, the verdict may be sustained if there is record and legal support for recovery under either theory.

### A.

The statutory basis for a claim for damages based on breach of an express warranty arising out of a sale of goods under Delaware law is found in this State's counterpart of the Uniform Commercial Code. Title 6, section 2–313(1) provides that express warranties of a seller of goods are created as follows:

 (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

 (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

 (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Additionally, 6 *Del.C.* § 2–313(2) states that:

 It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

 Title 6, section 2–313(1) and (2) are identical to § 2–313(1) and (2) of the Uniform Commercial Code. The official commentary to that section under the U.C.C. indicates that the drafters intended its warranty provisions to be construed and applied liberally in favor of a buyer of goods. *See* U.C.C. § 2–313 cmt. 1 (1977) ("Express warranties rest on 'dickered' aspects of the individual bargain, and go so clearly to the essence of that bargain that words of a disclaimer in a form are repugnant to the basic dickered terms."); U.C.C. § 2–313 cmt. 3 ("In actual practice affirmations of fact made by a seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement."); U.C.C. § 2–313 cmt. 4 ("[A] contract is normally a contract for a sale of something describable and described. A clause generally disclaiming 'all warranties, express or implied' cannot reduce the seller's obligation with respect to such description...."). The language of the U.C.C.'s official commentary may be applied by analogy to the sale of goods governed by 6 *Del.C.* § 2–313 in the reconciliation of any ensuing express warranty disputes. Thus, Bell's argument in this case that the express warranty terms in the manual are strictly limited to the "Five Year Limited Warranty" section, which also contained a purportedly effective disclaimer of those terms, is unfounded.

 Formal wording is not necessary to create a warranty and a seller does not have to express any specific intention to create one. *See Pack & Process, Inc. v. Celotex Corp.,* Del.Super., 503 A.2d 646, 658–59 (1985). Here the additional terms

---

**10.** The Superior Court granted Bell judgment as a matter of law as to Yarusso's claim of breach of implied warranty for a particular purpose but permitted the jury to consider the implied warranty claim based on merchantability.

found in the manual's "Introduction" and "Helmet Performance" sections (stating that "the primary function of a helmet is to reduce the harmful effects of a blow to the head ..." and "... the [helmet] is designed to absorb the force of a blow by spreading it over as wide an area of the outer shell as possible ...") are textual representations constituting affirmations of fact upon which a buyer is entitled to rely. While this Court does not appear to have specifically addressed the issue, other courts have held that express warranties can arise from similar textual representations found in owners' manuals even where not specifically labeled as such. *See e.g., Kinlaw v. Long Mfg. N.C., Inc.,* 298 N.C. 494, 259 S.E.2d 552, 557 (1979); *Hawkins Constr. Co. v. Matthews Co.,* 190 Neb. 546, 209 N.W.2d 643, 654–55 (1973).

■ The restrictive provision of 6 *Del.C.* § 2–316(1), renders Bell's effort to disclaim any express warranties in the manual's "Five Year Limited Warranty" ineffective as a matter of law. *See* U.C.C. § 2–316(1) cmt. 1 (stating that "this section ... seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty....."). While the manual contains disclaimers warning potential users that the helmet cannot prevent all injuries, other representations were made to assure a potential buyer that the helmet's liner was designed to reduce the harmful effects of a blow to the head. Those representations constituted essential elements of a valid express warranty that may not be effectively disclaimed as a matter of law. *See Jensen v. Seigel Mobile Homes Group,* 105 Idaho 189, 668 P.2d 65, 71–72 (1983) (holding that one principle of the law of warranty is to hold a seller responsible for its representations and assuring that a buyer receives that which he bargained for).

■ Bell argues that even if an express warranty was created and not effectively disclaimed here, the manual's textual representations promise only to prevent injuries to the head, not to a user's neck. Furthermore, Bell argues, the helmet's liner did crush as designed, thereby precluding a finding that the warranty was breached. Yarusso counters this argument by pointing out that injuries to the neck may logically follow a blow to the head, the helmet's liner did not sufficiently crush to prevent his injury and, as a result, he did not get what he bargained for. Upon review of the evidence, much of which was admittedly supplied by testimony of Yarusso's experts, the jury came to a logical conclusion that an express warranty was made in the helmet's manual. Upon consideration of this representation in relation to the specific facts of this case, they also concluded that the warranty was breached. In view of the evidence presented by the experts for both parties on the relationship between the helmet's design and the risk of neck injury, a factual predicate existed for the jury to determine whether there was a basis for recovery under the express warranty claim. The Superior Court did not err in submitting that issue to the jury.

### B.

■ Our holding sustaining the jury's verdict on the claim of breach of express warranty renders an in-depth consideration of Bell's implied warranty arguments unnecessary, since the jury was permitted to find a breach of warranty on alternative grounds. The Superior Court in rejecting Bell's post-trial motions also declined to rule on the merits of Bell's attack on the implied warranty finding in view of the jury's finding of liability on the express warranty claim. We also are not required to address Bell's contention that Yarusso was obligated, as a matter of law, to present evidence of a safer alternative design. *See Mazda Motor Corp. v. Lindahl,* Del. Supr., 706 A.2d 526, 530 (1998). We note, however, that Yarusso's experts never claimed that a helmet can reduce the probability of a user's neck injury in all circumstances, and they were not required to

present evidence that a helmet could be designed to achieve this. Expert evidence was presented, however, that a helmet could be designed with a softer liner that would, in theory, limit the amount of force placed on the user's neck, thereby reducing the probability of partial-load direct downward neck injuries, particularly upon impact with harder surfaces. There was, thus, a sufficient factual predicate for submission of the implied warranty claim to the jury.

## IV

In a related vein, Bell next argues that the jury's finding for Yarusso on breach of express and implied warranties is inconsistent with its finding that Bell was not negligent. Because the jury found no product defect leading to negligent conduct on Bell's part, it could not have properly found, the argument runs, that a defect existed in the helmet upon which any warranty claims relied. *See Ruffin v. Shaw Indus., Inc.*, 4th Cir., 149 F.3d 294, 301 (1998) (holding that the requirements of both actions are nearly alike and that a finding on one claim often "applies equally" to the other); *Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 365 N.W.2d 176, 186 (1984) (both actions "involve identical evidence and require proof of exactly the same elements"). In essence, Bell contends that because its product was not defective, a verdict in favor of Yarusso on warranty and negligence claims was precluded.[11]

A claim for breach of warranty, express or implied, is conceptually distinct from a negligence claim because the latter focuses on the manufacturer's conduct, whereas a breach of warranty claim evaluates the product itself. *See Cline v. Prowler Indus. of Md., Inc.*, Del.Supr., 418 A.2d 968, 978, n. 19 (1980) (the focus of a negligence claim is the manufacturer's conduct and the breach of an accepted standard of conduct); *Borel v. Fibreboard Paper Prod. Corp.*, 5th Cir., 493 F.2d 1076, 1094 (1973) (in a products liability case with inconsistent verdicts, it is within the jury's prerogative so long as evidence supports the finding); *Community Television Serv. v. Dresser Indus., Inc.*, D.S.D., 435 F.Supp. 214, 216 (1977) (jury could find defendant neither negligent nor strictly liable while finding as a matter of law that representations in a brochure created an express warranty that defendant breached). Based on the foregoing authorities, we find no fatal inconsistency between the jury's verdict negating negligence but finding breach of warranty.

## V

Finally, we consider Bell's contention that it was entitled to a mistrial after the discharge of one juror from the panel during deliberations. This claim is predicated on the fact that prior to the juror's dismissal, the panel indicated it was deadlocked. Because the juror was dismissed without an explanation, Bell claims that the remaining jurors were left with an impression that the juror had done something wrong and whichever side that juror was supporting would have "lost credibility." The jury's verdict was, therefore, conceivably swayed against Bell as a result of that juror's dismissal.

**11.** The jury was requested to determine the basis for Bell's liability in the following two-part inquiry.

> (1)(a) Do you find by a preponderance of the evidence that Bell Sports negligently designed the Bell Moto–5 Helmet?
>
> _____ YES _X_ NO
>
> (b) Do you find that Bell Sports breached an express or implied warranty when it sold Mr. Yarusso a Bell Moto–5 Helmet?
>
> _X_ YES _____ NO

If your answer to parts a or b of Question 1 is "Yes," go on to Question 2.

If, as Bell now asserts, a finding of no negligence in Answer (1)(a) precludes a finding as to breach of warranty, express or implied, it should have objected to the verdict form or requested a modification consistent with its present position, *i.e.*, that answer of "No" as to (1)(a) ends the liability inquiry. As we read the record, it tendered no objection to the verdict format.

■ The granting of a mistrial for juror misconduct is part of the trial judge's case management function and is reviewed under an abuse of discretion standard. *See Temple v. Raymark Indus.*, Del.Supr., 716 A.2d 975, 1998 WL 138929, at *2 (1998) (ORDER). We find no merit to this argument. It is undisputed that the trial judge determined that the dismissed juror shared no extraneous information with any other members on the panel prior to his dismissal. *Compare Diaz v. State*, Del. Supr., 743 A.2d 1166 (1999) (ruling juror's comments in open court regarding the interpretation of live testimony prejudicial). The trial judge dealt with the situation upon learning of the juror's misdeed by swiftly discharging him and subsequently allowed the jury to continue its deliberations. *Id.* Moreover, prior to trial, both parties had agreed that should circumstances warrant it, an eleven-member panel was acceptable. *See* Super. Ct.Civ.R. 48. The trial court did not abuse its discretion in dismissing this juror and there was no basis to order a mistrial.

The judgment of the Superior Court is AFFIRMED.