IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NELSON J. MUNIZ-RODRIGUEZ, | § | |
| | § | |
| Defendant Below, | § | No. 120, 2025 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. S2306005015 |
| | § | |
| Appellee. | § | |

Submitted: August 27, 2025
Decided: October 14, 2025

Before **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices.

## ORDER

After consideration of the brief and motion to withdraw filed by the appellant's counsel under Supreme Court Rule 26(c), the State's response, and the Superior Court record, it appears to the Court that:

(1) A Superior Court jury found the appellant, Nelson Muniz-Rodriguez, guilty of first-degree child abuse[1] and endangering the welfare of a child.[2] The

---

[1] *See* 11 *Del. C.* § 1103B (2022) ("A person is guilty of child abuse in the first degree when the person recklessly or intentionally causes serious physical injury to a child: (1) Through an act of abuse and/or neglect of such child . . . .").

[2] *See* 11 *Del. C.* § 1102(a)(1)a (2022) (providing that a person is guilty of endangering the welfare of a child when, "[b]eing a parent, guardian or any other person who has assumed responsibility for the care or supervision of a child the person . . . [i]ntentionally, knowingly or recklessly acts in a manner likely to be injurious to the physical, mental or moral welfare of the child . . . ."); *id.* § 1102(b)(2) (providing that endangering the welfare of a child is a Class G felony "[w]hen serious physical injury to a child occurs while the child's welfare was endangered").

charges stemmed from an incident that occurred on November 29, 2022. At that time, Yolanda Niz-Chilel and her child, who was approximately twenty-two months old (the "Child"), lived in an apartment in Seaford with Muniz-Rodriguez; his former significant other, Von Marie Hernandez-Ramirez; and Muniz-Rodriguez's brother.

(2) On the day of the incident, the Child remained at home in Nelson Muniz-Rodriguez's care while Niz-Chilel and Hernandez-Ramirez were at work.[3] At approximately 4:24 p.m., Nelson Muniz-Rodriguez and Hernandez-Ramirez arrived at the emergency department at Nanticoke Hospital with the Child, who was critically ill. Gastric contents and blood were coming from her nose and mouth, and her abdomen was very rigid and distended. The Child was diagnosed with a bowel perforation and transported by helicopter to Nemours Children's Hospital in Wilmington for emergency surgery. A surgeon at Nemours confirmed that the Child had a life-threatening laceration through the front of her stomach wall, which required repair, and other internal injuries.

(3) A detective and a Division of Family Services worker spoke with Muniz-Rodriguez at the apartment on the day after the incident, and they returned for a doll reenactment on the day after that. During the doll reenactment, Muniz-Rodriguez used a doll that the detective provided to demonstrate what had occurred

---

[3] Muniz-Rodriguez's brother either was not at home or was sleeping during the events at issue.

in the apartment on the day that the Child was injured. The detective also interviewed Muniz-Rodriguez at the police department on December 27, 2022. Muniz-Rodriguez acknowledged that he was the person responsible for the Child's care on the day of the incident. His account was that the Child had spilled yogurt on herself in the afternoon and he had placed her in the bathtub to clean up the mess. While he was briefly out of the room retrieving a towel, he heard a noise; he returned to the bathroom and found the Child face down in the bathtub. Muniz-Rodriguez said that he placed the Child on a bed and pressed on her abdomen. She vomited water, and he took her to the hospital.

(4) At trial, the surgeon and another Nemours physician testified that the Child's injuries were caused by a substantial, focal blow to her abdomen and were not consistent with having resulted from a fall in the bathtub. The second Nemours physician, who was a specialist in child-abuse pediatrics and had participated in child-death reviews across multiple jurisdictions, testified that she had never encountered a case in which a life-threatening gastric perforation was sustained by a party receiving CPR. She opined that the Child's injuries were the result of inflicted abuse rather than accidental trauma.

(5) In this direct appeal, Muniz-Rodriguez's counsel has filed a brief and a motion to withdraw under Supreme Court Rule 26(c). Counsel asserts that, based upon a conscientious review of the record, there are no arguably appealable issues.

3

Counsel informed Muniz-Rodriguez of the provisions of Rule 26(c) and provided him with a copy of the motion to withdraw and the accompanying brief. Counsel also informed Muniz-Rodriguez of his right to supplement counsel's presentation. Muniz-Rodriguez responded with points he wanted to present for the Court's consideration, which counsel included with the Rule 26(c) brief. The State has responded to the Rule 26(c) brief and argues that the Superior Court's judgment should be affirmed.

(6)    When reviewing a motion to withdraw and an accompanying brief under Rule 26(c), this Court must be satisfied that the appellant's counsel has made a conscientious examination of the record and the law for arguable claims.[4] This Court also must conduct its own review of the record and determine whether "the appeal is indeed so frivolous that it may be decided without an adversary presentation."[5]

(7)    Muniz-Rodriguez first argues that the State failed to collect or present at trial any video depicting the Child's arrival at the hospital, which would have shown that the Child was not as ill upon arrival as the evidence presented at trial suggested. Muniz-Rodriguez did not seek a missing-evidence instruction at trial, nor has he shown that video of the Child's arrival at the hospital, if such video

---

[4] *Penson v. Ohio*, 488 U.S. 75, 83 (1988); *McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429, 442 (1988); *Anders v. California*, 386 U.S. 738, 744 (1967).
[5] *Penson*, 488 U.S. at 82.

existed, would have been favorable to the defense. We find no plain error as to this issue.[6] Defense counsel cross-examined the emergency department physician about the Child's condition when she was examined in the emergency department, and there is no dispute that the Child had a perforation in her stomach, a condition that three physicians testified was life threatening. We can discern no plain error from a failure to collect or submit into evidence video of the Child's arrival at the hospital.

(8) Similarly, Muniz-Rodriguez asserts that his brother, who was in the apartment until 2:00 p.m., should have been called as a witness. He also states that he had two phone numbers and argues that the detective never requested the records from his second line. Muniz-Rodriguez consistently maintained that he alone was responsible for the Child's care on the day of the incident, and he never suggested that his brother had any exculpatory information. Nor has he shown that the detective was aware that Muniz-Rodriguez had two phone lines. We find no plain error as to these issues.

(9) Muniz-Rodriguez asserts that thirteen photographs that he sent to the detective during his interview at the police station—photographs suggesting a positive relationship between the Child and Muniz-Rodriguez, taken before the day

---

[6] *See Brown v. State*, 897 A.2d 748, 753 (Del. 2006) (finding no plain error as to defendant's contention that the trial court, *sua sponte*, should have given a missing-evidence instruction); *see also Tisinger v. State*, 2025 WL 2047466, at \*2 (Del. July 22, 2025) (reviewing claim that the prosecution withheld information from the defense for plain error where the claim was not raised below).

of the incident—disappeared from the detective's phone and were not submitted as evidence at trial. In the video of the interview, Muniz-Rodriguez describes photos that he wants to send to the detective, and the video shows the detective's response to receiving thirteen photos. At trial, the prosecutor asked the detective what happened to the photographs, and the detective stated that he later looked for them but could not find them. The detective continued that he "reached out to the defendant on a couple occasions,"[7] at which point defense counsel objected.

(10) At sidebar, defense counsel stated that she believed that the detective would testify that he had reached out to Muniz-Rodriguez multiple times to ask that he resend the photographs, and Muniz-Rodriguez did not respond. Counsel argued that Muniz-Rodriguez had no obligation to resend the photos; it would be prejudicial to suggest that he was uncooperative with the investigation; and there was no verification that Muniz-Rodriguez ever received the detective's messages.[8] In response to a question from the court, defense counsel indicated that she did not intend to "get into the existence or the fact that those pictures were missing."[9] We conclude that Muniz-Rodriguez waived his argument concerning the thirteen photographs. Moreover, the evidence that was presented to the jury reflected that Muniz-Rodriguez had multiple photos that he voluntarily shared with the detective,

---

[7] Appendix to Opening Brief at A352.
[8] *Id.* at A352–53.
[9] *Id.* at A354.

thus implying that they reflected favorably on his relationship with the Child. We find no reversible error as to this issue.

(11) Muniz-Rodriguez also asserts that the Child had to wait longer to see a doctor than the medical records suggested; questions why emergency department personnel did not call DFS sooner; argues that there were inconsistencies in the physicians' estimates about the timing of the injury; and contends that the doll reenactment might not have reflected the amount of pressure he used when pressing on the Child's stomach, because he was not under the same amount of stress. We construe these arguments as an insufficient-evidence claim and conclude that Muniz-Rodriguez has not demonstrated plain error.[10] To the extent that Muniz-Rodriguez has identified inconsistencies, they "were such as would usually be found in the trial of criminal cases"[11] and merely presented factual issues for the jury to resolve.[12] Defense counsel had the opportunity to cross-examine the witnesses about the possible causes and likely timing of the injury, and there was no dispute that Muniz-Rodriguez was the Child's caregiver on the day at issue.

---

[10] *See Williamson v. State*, 113 A.3d 155, 157 (Del. 2015) ( "[I]t is well-settled that in a jury trial, if a defendant fails to make a motion for acquittal to the trial court, the defendant has failed to preserve the right to appeal the issue of the sufficiency of the evidence to convict, and we would apply the plain error standard of review.").

[11] *Zutz v. State*, 160 A.2d 727, 729 (Del. 1960).

[12] *See Romeo v. State*, 21 A.3d 597, 2011 WL 1877845, at *3 (Del. May 13, 2011) (TABLE) ("[M]ere contradictions in trial testimony establish a credibility question for the jury."); *see also Knight v. State*, 690 A.2d 929, 932 (Del. 1996) ("It is well-settled that the trier of fact is the sole judge of the credibility of the witnesses and responsible for resolving conflicts in the testimony." (internal quotation omitted)).

(12) Finally, Muniz-Rodriguez challenges the translation provided by the court interpreter who translated Hernandez-Ramirez's testimony from Spanish to English at trial. More specifically, he argues that certain Spanish words and phrases that appeared in text messages between Muniz-Rodriguez and Hernandez-Ramirez have different meanings depending on the speaker's country of origin.

(13) Before trial, the State had a Spanish-speaking law-enforcement officer translate the text messages, and the State provided the translation to defense counsel. During the pretrial conference, the State sought leave to submit into evidence copies of the text messages, with the officer's translations written next to them. Defense counsel objected based on potential regional differences in translation because the officer was from Ecuador, not from Puerto Rico like Muniz-Rodriguez and Hernandez-Ramirez. As an alternative, the State proposed that they could write the court interpreter's translation next to the messages and submit that into evidence. The court indicated that it likely would not admit written translations of the text messages because of the different possible meanings.

(14) At trial, when Hernandez-Ramirez was reading the text messages, the court interpreter raised the issue that certain words in the text messages have different meanings for different speakers and requested guidance as to how to

proceed.[13]  At sidebar, the prosecutor explained that Muniz-Rodriguez had written, in response to a question from Hernandez-Ramirez about whether Muniz-Rodriguez had checked on the Child, that he had not because whenever the Child saw him she started crying and he did not want to have to "romperle la cara," which the Spanish-speaking officer had translated as "break her face."[14]  The court determined that the prosecutor should ask the witness what she understood the phrase to mean.  As her testimony continued, Hernandez-Ramirez explained that in Puerto Rico, "romperle la cara" is "just a saying," "[a]s if I am going to punch you in your face," but that she did not take it seriously because she understood that Muniz-Rodriguez would not hit the Child.[15]  The testimony proceeded similarly as to other texts, including one in which Muniz-Rodriguez asked if he could "pescozon" the Child, which Hernandez-Ramirez testified meant to give her a slight or soft tap.  Hernandez-Ramirez replied that he could not and told him to check on the Child and not to be a "majadero," which Hernandez-Ramirez testified meant "annoying."[16]

(15)  We find no error as to this issue.  The court denied the State's request to admit written translations, which avoided giving a particular translation extra

---

[13] *See* Appendix at A-216 ("I can say what the term means as it's usually [used], but for some people, it has different meanings.").
[14] *See id.* at A-217.
[15] *Id.* at A-218-19.
[16] *Id.* at A-219-20.

weight.[17] Hernandez-Ramirez testified with the assistance of a certified interpreter, who informed the court when the words used might be subject to different interpretations.[18] And Hernandez-Ramirez was permitted to testify about her understanding of the messages that she exchanged with Muniz-Rodriguez and was subject to cross-examination about the messages. We find no reversible error as to this issue.

(16) We have reviewed the record carefully and conclude that Muniz-Rodriguez's appeal is wholly without merit and devoid of any arguably appealable issue. We also are satisfied that Muniz-Rodriguez's counsel has made a conscientious effort to examine the record and has properly determined that Muniz-Rodriguez could not raise a meritorious claim in this appeal.

---

[17] *Cf. Diaz v. State*, 743 A.2d 1166, 1183 (Del. 1999) ("When a prior out-of-court statement was originally given in another language, it is imperative that the trial judge ascertain the accuracy of that translation *before* the English interpretation of the statement is admitted into evidence.").

[18] *See generally* COURT INTERPRETERS CODE OF PROF. RESP., Canon 1(A)-(C), annex to Admin. Directive No. 107 (Del. 1996) (providing that "[i]nterpreters should never characterize or give a gratuitous explanation of testimony," "[i]f interpreters do not understand what is being said, they must inform the court and request permission of the court to have the statement repeated or clarified," and "[i]f counsel or the court utilize a term or phrase which the interpreters believe may confuse the non-English speaking witness, the interpreter should so inform the court"), *available at* https://courts.delaware.gov/forms/download.aspx?id=134358.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.  The motion to withdraw is moot.

BY THE COURT:

*/s/ Abigail M. LeGrow*
Justice